UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DENIS DRENI,                                    :        Civil Action No.: 1:18-cv-12017-PAE
                                                :
                          Plaintiff,            :
                                                :
v.                                              :
                                                :
PRINTERON AMERICA CORPORATION,                  :
                                                :
                          Defendant.            :
-------------------------------------------------------------X
-------------------------------------------------------------X
PRINTERON AMERICA CORPORATION,                  :
                                                :
                  Counterclaim Plaintiff,       :
                                                :
v.                                              :
                                                :
DENIS DRENI,                                    :
                                                :
                  Counterclaim Defendant.       :
-------------------------------------------------------------X


### DEFENDANT/COUNTERCLAIM PLAINTIFF
### PRINTERON AMERICA CORPORATION'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT


**DRINKER BIDDLE & REATH LLP**
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
Telephone:  (212) 248-3140

*Attorneys for Defendant/Counterclaim Plaintiff
PrinterOn America Corporation*


Of Counsel and On the Brief:
Tracey Salmon-Smith, Esq.
Lucas B. Michelen, Esq.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................... 1

FACTUAL BACKGROUND ........................................................................... 2

    A.    Plaintiff's Employment Agreement and Commission Plans Governed His Employment and Compensation. ................................................. 2

    B.    Fiscal Year 2013 and the Docomo Account. ......................................... 4

        1.    Negotiations Surrounding the Docomo Pre-Payment Contract Began in October 2011. ................................................. 4

        2.    The Docomo Account was Explicitly Excluded from Dreni's Commission Plan ................................................................ 5

    C.    Plaintiff's Termination and Failure to Sign Release. ............................. 8

        1.    Payments Due to Plaintiff Upon Termination Under his Employment Agreement. ............................................... 8

        2.    The Employment Agreement Required Dreni to Sign a Release Upon Termination. ................................................... 9

        3.    Payments to Dreni After Termination. ....................................... 9

        4.    Plaintiff's Post-Termination Obligations to Sign a Release. ................... 10

STANDARD OF REVIEW ........................................................................... 10

ARGUMENT ............................................................................................... 12

I.    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED AS A MATTER OF LAW. ............................................................................................ 12

    A.    Plaintiff Does Not Have a Viable Cause of Action under NYLL Sections 193 and 198 Because an Alleged Failure to Pay a Commission is not a "Deduction." ................................................................. 12

    B.    Plaintiff's Claim for Commissions Owed on the August 12, 2012 Docomo Invoice is Barred by New York's Six-Year Statute of Limitations. ................... 14

    C.    Plaintiff Has Produced No Evidence to Support his Breach of Contract Claim ................................................................................... 15

        1.    Plaintiff is Not Entitled to Commissions for the $1 Million Docomo Pre-Payment Agreement. ........................................... 16

i

2.      According to Plaintiff's Employment Agreement, He is Not Entitled to Post-Termination Commissions for Any Sale that was Not Invoiced Prior to his Termination. ................................................... 17

D.      Plaintiff Accepted a Severance Payment of $155,769.23 and Thus Waived His Right to Sue PrinterOn. ............................................................................. 19

E.      Plaintiff's Breach of the Covenant of Good Faith and Fair Dealing is Redundant to Plaintiff's Breach of Contract Claim and Should Be Dismissed. .......................................................................................................... 21

II.     PRINTERON IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM BECAUSE PLAINTIFF BREACHED HIS EMPLOYMENT AGREEMENT BY FAILING TO EXECUTE THE REQUIRED RELEASE. ................................................................................................ 21

CONCLUSION ................................................................................................................ 24

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**C**ASES

*ABB Indus. Sys., Inc. v. Prime Tech, Inc.*,
120 F.3d 351 (2d Cir. 1997)......................................................................................14

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................11, 12

*Axginc Corp. v. Plaza Automall, Ltd.*,
759 F. App'x. 26 (2d Cir. 2018) ..............................................................................23

*Bader v. Wells Fargo Home Mortg., Inc.*,
No. 09 Civ. 9410 PAE, 2012 WL 1428898 (S.D.N.Y. Apr. 25, 2012) ...................15

*Baguer v. Spanish Broad. Sys., Inc.*,
No. 04 Civ. 8393 (RJS), 2010 WL 2813632 (S.D.N.Y. July 12, 2010) ..................21

*CCM Rochester, Inc. v. Federated Inv'rs, Inc.*,
234 F. Supp. 3d 501 (S.D.N.Y. 2017).....................................................................21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................................11

*Ely-Cruikshank Co. v. Bank of Montreal*,
81 N.Y.2d 399 (N.Y. 1993) .....................................................................................14

*F.D.I.C. v. Great Am. Ins. Co.*,
607 F.3d 288 (2d Cir. 2010)......................................................................................11

*Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*,
84 F.3d 91 (2d Cir. 1996)..........................................................................................22

*Gold v. Am. Med. Alert Corp.*,
No. 14 Civ. 5485 JFK, 2015 WL 4887525 (S.D.N.Y. Aug. 17, 2015) ...................13

*Goldberg v. Jacquet*,
667 F. App'x 313 (2d Cir. 2016) ........................................................................12, 13

*Golden Pac. Bancorp. v. F.D.I.C.*,
375 F.3d 196 (2d Cir. 2004)......................................................................................11

*Graff v. Enodis Corp.*,
No. 02 CIV. 5922 (JSR), 2003 WL 1702026 (S.D.N.Y. Mar. 28, 2003) ................18

*Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*,
    18 N.Y.3d 765 (N.Y. 2012) ............................................................................14

*Hummel v. AstraZeneca LP*,
    575 F. Supp. 2d 568 (S.D.N.Y. 2008) ..........................................................19

*Johnson v. Nextel Commc'ns Inc.*,
    660 F.3d 131 (2d Cir. 2011) ...................................................................15, 22

*Komlossy v. Faruqi & Faruqi, LLP*,
    No. 15 Civ. 9316 (KPF), 2017 WL 722033 (S.D.N.Y. Feb. 23, 2017) ..................................13

*Kosher Sports, Inc. v. Queens Ballpark Co., LLC*,
    513 F. App'x 106 (2d Cir. 2013) .................................................................23

*Malinowski v. Wall St. Source, Inc.*,
    No. 09 CIV. 9592 PAE, 2012 WL 279450 (S.D.N.Y. Jan. 31, 2012) ..............................13, 14

*Monagle v. Scholastic, Inc.*,
    No. 06 CIV. 14342 GEL, 2007 WL 766282 (S.D.N.Y. Mar. 9, 2007) ..................................13

*N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel, LLC*,
    293 F.3d 550 (2d Cir. 2002) ......................................................................11

*Opals on Ice Lingerie v. Bodylines Inc.*,
    320 F.3d 362 (2d Cir. 2003) ......................................................................11

*Resurgence Asset Mgt., LLC v. Gidumal*,
    176 A.D.3d 520 (1st Dep't 2019) .................................................................23

*Schanfield v. Sojitz Corp. of Am.*,
    663 F. Supp. 2d 305 (S.D.N.Y. 2009) ..........................................................22

*Simas v. Merrill Corp.*,
    No. 02 CIV.4400 RCC, 2004 WL 213013 (S.D.N.Y. Feb. 4, 2004) ....................................18

*V.E.C. Corp. of Delaware v. Hilliard*,
    896 F. Supp. 2d 253 (S.D.N.Y. 2012) ..........................................................14

*Volk v. Liggett Grp. Inc.*,
    No. 96 CIV. 1921 SS, 1997 WL 107458 (S.D.N.Y. Mar. 11, 1997) ..............................20, 21

*VW Credit, Inc. v. Big Apple Volkswagen, LLC*,
    No. 11 CIV. 1950 PAE, 2012 WL 919386 (S.D.N.Y. Mar. 15, 2012) ..................................11

*Winters v. Am. Express Tax & Bus. Servs., Inc.*,
    No. 04-CV-8451(KMK), 2007 WL 632765 (S.D.N.Y. Feb. 27, 2007) ..................................11

*World Auto Parts, Inc. v. Labenski,*
    217 A.D.2d 940 (4th Dep't 1995) ..........................................................................23

**STATUTES, RULES & REGULATIONS**

CPLR § 213 ...........................................................................................................14

Fed. R. Civ. P. 56 ...............................................................................................1, 11

Local Rule 56.1 .......................................................................................................2

New York Labor Law § 193 ...............................................................1, 12, 13, 14

New York Labor Law § 198 .....................................................................12, 14

Defendant/Counterclaim Plaintiff PrinterOn America Corporation ("PrinterOn") respectfully submits this memorandum of law in support of its motion for summary judgment, pursuant to Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

Plaintiff/Counterclaim Defendant Denis Dreni ("Plaintiff" or "Dreni") is a former PrinterOn salesperson who asserts claims for unpaid commissions.  This Court can and should resolve  this case based on the express terms of the governing employment agreement and commission plans, as well as the unrebutted evidence that PrinterOn performed all of its obligations under these agreements.

Although Plaintiff alleges that PrinterOn failed to properly pay commissions it owed both during and after his employment, his claims have not been borne out by discovery.  To the contrary, discovery has confirmed that Plaintiff's claims suffer a number of fatal flaws that warrant entering judgment in PrinterOn's favor.

Discovery has made clear that Plaintiff's claims should be dismissed as a matter of law for a number of reasons.  First, Plaintiff's New York Labor Law ("NYLL") claim must be dismissed because alleged nonpayment of commissions is not a "deduction" pursuant to NYLL § 193, and his claim cannot proceed as a matter of law.

Second, New York's six-year statute of limitations bars Plaintiff's claim that PrinterOn owes him commission based on the 2012 sale of 7,500 prepaid PrinterOn licenses to Docomo interTouch Pte. Ltd. ("Docomo").  This claim accrued on August 12, 2012, when PrinterOn invoiced the sale and the commissions would have been deemed "earned"; however, Plaintiff did not file suit until well over six years later, on November 1, 2018.

Third, Plaintiff's breach of contract claim should be dismissed as a matter of law.  The express terms of his Employment Agreement and commission plans clearly refute Dreni's

1

arguments that PrinterOn failed to pay him commissions on the Docomo pre-paid license sale and post-termination commissions.

Fourth, all of Plaintiff's claims must be dismissed because under the terms of his Employment Agreement, his acceptance of a lump sum severance payment waived his right to bring claims against PrinterOn.

Fifth, Plaintiff's breach of implied covenant of good faith and fair dealing claim must be dismissed because it is duplicative of his breach of contract claim.

Additionally, PrinterOn is entitled to summary judgment on its breach of contract counterclaim (its fourth cause of action) because there is no genuine issue of material fact that Plaintiff breached his Employment Agreement by failing to execute a release after accepting a lump sum severance payment and by initiating this action.

For the foregoing reasons, PrinterOn respectfully requests that this Court grant its motion for summary judgment.

## FACTUAL BACKGROUND

### A.   Plaintiff's Employment Agreement and Commission Plans Governed His Employment and Compensation.

Founded in 2001, PrinterOn is a corporation that offers secure printing services to organizations through its True Cloud Printing technology.  (SOF ¶ 1.)[1]  PrinterOn offers software that provides clients with cloud-based printing capabilities in both private and public settings. (*Id.* ¶ 2.)  During Dreni's employ with PrinterOn, Angus Cunningham ("Cunningham") served as the Chief Executive Officer and President of PrinterOn.  (*Id.* ¶ 4.)  Kenneth Noreikis ("Noreikis") served as the Vice President of Sales and Marketing.  (*Id.* ¶ 5.)

---

[1]   Defendant/Counterclaim Plaintiff PrinterOn America Corporation's Local Rule 56.1 Statement of Undisputed Facts (the "SOF") is submitted herewith.

On or about May 4, 2012, a mutual acquaintance introduced Dreni to Noreikis, who then discussed a potential employment opportunity for Dreni with the company.  (*Id.* ¶ 13.)  Over the next six weeks, the parties negotiated the terms of Dreni's potential employment agreement.  (*Id.* ¶ 16.)  On June 22, 2012, PrinterOn hired Dreni as its Director of Strategic Alliances & Enterprise Accounts, and the parties executed Plaintiff's Employment Agreement (the "Employment Agreement").  (*Id.* ¶¶ 14-15, 17.)  At the time of his hire, Dreni's salary was composed of a $135,000 base salary, and variable commission components that were contingent on his personal sales performance (his personal target) and the company's performance (his company target).  (*Id.* ¶¶ 20-24.)

Throughout his employ, PrinterOn issued Dreni commission plans that governed his commission payments and explained how PrinterOn calculated Dreni's earned commissions.  (*Id.* ¶¶ 24-29.)  Dreni's initial commission plan—the Fiscal 2013 Commission Plan (the "2013 Commission Plan")—governed how Dreni's commissions were calculated during his first year at PrinterOn, which was from June 22, 2012 (his hire date) to May 1, 2013.  (*Id.* ¶ 22.)  Over the course of Dreni's employment, PrinterOn issued new commission plans to govern Dreni's compensation.  (*Id.* ¶ 25.)

PrinterOn paid Dreni commissions on a monthly basis.  (*Id.* ¶ 12.)  In order to calculate commissions, Margaret Ritchie ("Ritchie"), Director of Finance/Chief Financial Officer, engaged her finance team to prepare a month-end close process based on billings, which she cross-referenced or reconciled to other sources.  (*Id*. ¶ 11.)  Ritchie then prepared the prior month's commission report at the beginning of the following month for payroll, which occurred in the middle of the month.  (*Id.* ¶ 12.)

For all employees, including Dreni, PrinterOn deemed commissions "earned" when

PrinterOn invoiced the client (sometimes referred to as "billed").  (*Id.* ¶¶ 7-9.)  Invoicing

triggered all PrinterOn commission payments to salespeople.  (*Id.* ¶ 9.)

**B.**     **Fiscal Year 2013 and the Docomo Account.**

**1.**     **Negotiations Surrounding the Docomo Pre-Payment Contract Began in October 2011.**

Dreni's primary claim is that, under the 2013 Commission Plan, he was entitled to

commissions on a $1 million agreement between PrinterOn and Docomo (the "Docomo Pre-

Payment Agreement").  (Compl. ¶¶ 30-31 (ECF No. 7).)  Under the Docomo Pre-Payment

Agreement, Docomo agreed to pre-pay $1,000,000 in exchange for the right to resell and

distribute a set number of PrinterOn subscriptions.  (*Id.* ¶ 15.)  Docomo and PrinterOn negotiated

this Agreement months before Dreni's hire, and any applicable commissions were explicitly

excluded from his 2013 Commission Plan.  (*Id.* ¶¶ 31-32.)

Docomo is in the hospitality business and purports to be one of the largest providers of

high-speed internet service for hotels in the Asia-Pacific region.  (*Id.* ¶ 30.)  On February 28,

2012, Docomo and PrinterOn entered into a term sheet, establishing a reseller and distributor

agreement between the parties (the "Letter of Intent").  (*Id.* ¶ 31.)  Although the parties executed

the Letter of Intent in February 2012, it resulted from negotiations between PrinterOn and

Docomo that occurred six to twelve months prior.  (*Id.* ¶ 32.)  The Letter of Intent provided that

"[u]pon execution of the Reseller and Distribution Agreement DOCOMO interTouch shall pay to

PrinterOn a one-time sum of US$1,000,000 for the 7,500 annual PrinterOn subscriptions."  (*Id.* ¶

33.)

Between March 2012 and June 22, 2012 (the date PrinterOn hired Dreni), Docomo and

PrinterOn drafted, negotiated, and revised the terms of an agreement to memorialize Docomo's

$1 million purchase of PrinterOn subscriptions.  (*Id.* ¶ 34.)

### 2.     The Docomo Account was Explicitly Excluded from Dreni's Commission Plan.

Before Dreni's employment with PrinterOn, and during the negotiations of Dreni's Employment Agreement, Noreikis advised Dreni that the Docomo $1 million pre-payment ("Docomo Pre-payment") mentioned in the Letter of Intent would not be included as part of his commission calculations. (*Id.* ¶¶ 35-42.) On June 2, 2012, PrinterOn sent Dreni a model for his compensation plan that outlined how PrinterOn planned to pay his commissions. (*Id.* ¶ 36.) The compensation model, which listed accounts Dreni would potentially work on, stated next to "Docomo" that "pre-payment does not apply to company target." (*Id.* ¶ 37.) That same day, Dreni responded to the compensation model by asking Noreikis why the Docomo Pre-payment would not count towards his Company Target in the 2013 Commission Plan. (*Id.* ¶ 38.) Noreikis explained that it was excluded for several reasons. (*Id.* ¶ 39.) Dreni did not challenge this exclusion. (*Id.* ¶ 40.)

Additionally, during Dreni's hiring negotiations with PrinterOn, Noreikis explained to Dreni that he was not sure if the Docomo Pre-Payment Agreement would "sign days before he started or two days after he started, and that for purposes of compensation plan, the million dollar project at Docomo would not accrue to a sales compensation for either the personal number or the company number." (*Id.* ¶ 41.) Noreikis also testified that he "clearly communicated" to Dreni that commissions from the Docomo Pre-Payment Agreement would not be applied to his personal or company commission target. (*Id.* ¶ 42.)

The 2013 Commission Plan executed on June 22, 2012 explicitly described Dreni's responsibilities for Docomo and demonstrates that Dreni was not entitled to commissions for the Docomo Pre-Payment Agreement. (*Id.* ¶ 48.) At the time of the 2013 Commission Plan execution, PrinterOn and Docomo had been engaged in negotiations for months and were in the

last steps of finalizing the Docomo Pre-Payment Agreement.  (*Id.* ¶ 34.)  PrinterOn, however,

believed it could benefit by expanding its relationship with Docomo to Docomo's parent

company, NTT Docomo (which, in 2012, purported to be the largest cellular network operator in

Japan), and its affiliate, Nomadix (the hardware manufacturing division of Docomo).  (*Id.* ¶¶ 43-

47.)  The 2013 Commission Plan captured this understanding.  (*Id.*  ¶ 48.)  The "Specific

partners/targets," section of the 2013 Commission Plan (the only section that mentions Docomo)

states:  "Docomo – Expand relationship to Nomadix and NTT Docomo (parent)."  (*Id.*)

Consistent with the 2013 Commission Plan, PrinterOn assigned Dreni the responsibility of

growing PrinterOn's relationship with Nomadix and NTT Docomo, and he did not have any day-

to-day responsibility for Docomo.  (*Id.* ¶ 49.)

On or about August 12, 2012, PrinterOn issued Invoice No. 2000011315 for $1 million to

Docomo for 7,500 pre-paid software licenses.  (*Id.* ¶ 50.)  On August 15, 2012, Noreikis made

Dreni aware that PrinterOn received the executed Docomo Pre-Payment Agreement and that

Cunningham planned to mail the invoice to Docomo for $1 million.  (*Id.* ¶ 51.)

Subsequently, Dreni acknowledged that the Docomo Pre-Payment Agreement was to be

excluded from the commission calculations under his 2013 Commission Plan.  (*Id.* ¶¶ 53-57.)

During Dreni's first year at PrinterOn, he vigorously questioned PrinterOn's management team

about his commission calculations, to which they would provide detailed responses and

explanations.  (*Id.* ¶ 54-57.)  During these discussions, Dreni consistently confirmed his

understanding that the Docomo Pre-Payment Agreement was not intended to be included in his

commission calculations.  (*Id.* ¶¶ 53-57.)   For example, when Dreni raised questions to

Noreikis about the 2013 Commission Plan on January 15, 2013, he stated

> **I agreed with you, that Docomo will not be part of my**
> **company number**, even though from a personal perspective and

> as good businessman to myself and my family the deal I agreed
> with you did not add-up logically to me because it is a company
> number and after my signature, I become part of the company.
> **Regardless of Denis logic, I still agreed with you as a gentleman
> and in contract, since you asked me and I honored it the whole
> way.**

(*Id.* ¶ 54) (emphasis added).

In May 2013, the close of Fiscal Year 2013, PrinterOn and Dreni discussed Dreni's final commission payments for the year.  (*Id.* ¶ 55-56)  During those conversations, Dreni again made clear his understanding that commissions from the Docomo Pre-Payment Agreement were excluded from commission calculations under his 2013 Commission Plan.  (*Id.* ¶ 56) (May 14, 2013 email from Dreni stating "**I am NOT asking** for you to include the Docomo number as part of my FY13 commission benefit...I will honor that gentleman agreement that you asked of me till the end. (it is not in my contract btw, I never thought it was.  On the contrary Docomo was part of my targeted accounts.")); (*Id.*) (May 14, 2013 email from Plaintiff stating "[r]egardless of how Docomo was used to incentivize me to join, I am not asking to benefit from 1 million of DoCoMo.  I hope this is clear."); (*Id.*) (May 14, 2013 email from Plaintiff stating "[a]gain, I am not asking to be paid commission on the 1 million dollar Docomo order.");  (*Id.*) (May 14, 2013 email from Plaintiff stating "I will hold to the gentleman agreement that Docomo even though my corporate account, will not account as my personal number.").  At the end of the discussions, the ultimate conclusion remained that the Docomo Pre-Payment Agreement would not be included in Plaintiff's commission calculations.  (*Id.* ¶ 57.)

For the 2013 Fiscal Year, Plaintiff received $116,186.20 in total commissions, in addition to his $135,000 base salary.  (*Id.* ¶ 58.)

C.   **Plaintiff's Termination and Failure to Sign Release.**

    1.    **Payments Due to Plaintiff Upon Termination Under his Employment Agreement.**

On January 4, 2018, PrinterOn terminated Dreni pursuant to Article 4.1(D) of the

Employment Agreement.  (*Id.* ¶ 59.)  Article 4.1(D) provides:

> 4.1 Terms and Conditions.   The employment contemplated hereunder maybe terminated in the following manner and in the following circumstances:
>
> (D) by the Corporation for any reason other than a termination pursuant to subsections 4.1(A), (B) or (C), upon providing a lump sum payment of an amount equal to either (a)… or (b) if after the first ninety (90) days of employment, an amount equal to six (6) months' Base Salary plus two (2) additional weeks of Base Salary for each full year of employment with the Corporation following the Effective Date (to a maximum of twelve (12) additional months of Base Salary **and any applicable outstanding commissions up to the date of such termination** plus any valid outstanding expense reimbursements owing to the Employee….

(*Id.* ¶ 60) (emphasis added).

Per Article 4.1(D), upon Plaintiff's termination, he would be due "applicable outstanding

commissions up to the date of such termination . . . ."  (*Id.*)  Plaintiff's commissions were

considered "earned" for the purpose of calculating commissions at the time PrinterOn invoiced a

client for any purchase.  (*Id.* ¶ 7-9.)  Additionally, the 2017 Commission Plan, which governed

Plaintiff's commission calculations at the time of his termination, stated that Plaintiff's

commissions were calculated based on "invoiced sales."  (*Id.* ¶ 61.)

When the parties negotiated the terms of Dreni's Employment Agreement, Dreni

proposed changes to Article 4.1(D) that would entitle him to commission earned upon

termination and "scheduled to be paid in the next six months."  (*Id.* ¶ 62.)  PrinterOn rejected this

proposal in a June 18, 2012 written email and June 19, 2012 call between Dreni and

Cunningham.  (*Id.* ¶ 63.)  Dreni's final Employment Agreement did not include this term.  (*Id.* ¶ 64.)

### 2.    The Employment Agreement Required Dreni to Sign a Release Upon Termination.

The Employment Agreement also contained a provision titled "Release of Claims."  (*Id.* ¶ 81.)  Under this provision, Dreni was required to execute a "full and final release of all claims and possible claims, as well as an indemnity for Employee's taxes, in favor of the PrinterOn Group and its shareholders, directors, officers and employees in a form acceptable to [PrinterOn]" if Dreni was paid "any amounts by [PrinterOn] in excess of any amounts owing to the [Plaintiff] pursuant to applicable legislation" upon his termination.[2]  (*Id.* ¶82)

### 3.    Payments to Dreni After Termination.

Upon his termination, Dreni was provided with a termination letter dated January 4, 2018 ("Termination Letter"), which set forth the terms of his termination.  (*Id.* ¶ 65.)  PrinterOn paid Dreni $49,842.33 and $155,769.23 (both before tax withholdings), as set forth in the Termination Letter.  (*Id.* ¶¶ 66, 68.)  The $49,842.33 payment was comprised of:  outstanding vacation pay ($14,278.85), salary due to June January 4, 2018 ($7,670.45), Plaintiff's 2017 KPI bonus ($20,367.22), commissions on December 2017 invoicing ($2,108.19), and commission on orders not processed   ($5,417.63).  (*Id.* ¶ 67.)  The $155,769.23 represented a lump sum severance payment for 36 additional weeks of salary.  (*Id.* ¶ 69.)

Ritchie calculated the commissions owed to Dreni for the month of December 2017 and

---

[2]      Section 4.3 also provided that if Plaintiff was terminated or if he resigned, but was not paid in excess of an applicable legislation, he "shall have no claim against the PrinterOn Group for damages, termination pay, severance pay, pay in lieu of notice of termination, statutory or otherwise, except in respect of payment of remuneration earned, due and owing to the effective date of termination and the right to dispute whether the termination was for Cause."  (*Id.* ¶ 82)

for the days leading up to his termination in January 2018.  (*Id.* ¶ 71.)  Ritchie also calculated

commissions on orders that had not yet been processed.  (*Id.* ¶ 72.)

### 4. Plaintiff's Post-Termination Obligations to Sign a Release.

The Termination Letter also stated that Dreni had "certain ongoing obligations including,

but not limited to the fact that you must . . . [s]ign and return without any modification the

enclosed Waiver and General Release (Appendix B) to Denise Williams by January 19, 2018."

(*Id.* ¶ 83.)  The Waiver and General Release was attached to the Termination Letter and stated

that Dreni would release PrinterOn from:

> all liability, claims, damages, attorney's fees, and causes of action
> of every kind in connection with matters, facts or events through
> the effective date of this Release.  This release extends, without
> limitation, to all claims for or relating to:  wrongful discharge or
> retaliation; any contract of employment, express or implied; any
> covenant of good faith and fair dealing, express or implied;
> incentive pay, commissions, or bonuses; vacation; any public
> policy violation; any tort of any nature; monetary or other personal
> relief; all claims for wages for overtime allegedly not paid whether
> under state or federal law; discrimination, including harassment,
> arising under any federal, state, or local statutory or common law,
> such as Title VII of the Civil Rights Act of 1964, as amended, the
> Americas With Disabilities Act, as amended, the Age
> Discrimination in Employment Act ("ADEA"), the Older Workers
> Benefit Protection Act, 42 U.S.C. § 1981, the Worker Adjustment
> and Retraining Notification Act, the Employee Retirement Income
> Security Act, or any other federal, state, or local law relating to
> employment or employment discrimination; early or phased
> retirement benefits; and any claims for attorney's fees and costs.

(*Id.* ¶ 84.)

Following his termination, Dreni did not execute the Waiver and General Release.  (*Id.* ¶

85.)  Dreni initiated the instant action on November 1, 2018.  (*Id.* ¶ 86.)

## **STANDARD OF REVIEW**

To prevail on a motion for summary judgment, the moving party must show that there is

no genuine, triable issue of material fact, and that it is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *VW Credit, Inc. v. Big Apple Volkswagen, LLC*, No. 11 CIV. 1950 PAE, 2012 WL 919386, at *2 (S.D.N.Y. Mar. 15, 2012); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If a moving party seeks dismissal of the non-moving parties' claims, it can discharge its initial burden by demonstrating that there is an absence of evidence to support the non-moving party's case on an issue for which the non-moving party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  The burden then shifts to the non-moving party, which must raise a genuine issue of material fact.  *Anderson*, 477 U.S. at 250.

To carry its burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor, and "may not rely on mere conclusory allegations [or] speculation." *Golden Pac. Bancorp. v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted); *see also F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citations and internal quotation marks omitted) ("[T]he non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation").  The adverse party "may not rest upon the mere allegations or denials of [its] pleading, but the adverse party [ ] must set forth specific facts showing that there is a genuine issue for trial."  *Winters v. Am. Express Tax & Bus. Servs., Inc.*, No. 04-CV-8451(KMK), 2007 WL 632765, at *4 (S.D.N.Y. Feb. 27, 2007) (citing Fed. R. Civ. P. 56(e)).

Additionally, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact."  *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 368 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 247-48).  "A dispute is not 'genuine' unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *N.Y. Stock Exch., Inc. v. New York, N.Y. Hotel, LLC*, 293 F.3d 550, 554 (2d

Cir. 2002) (*quoting Anderson*, 477 U.S. at 248).

## ARGUMENT

## I.   PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED AS A MATTER OF LAW.

### A.   Plaintiff Does Not Have a Viable Cause of Action under NYLL Sections 193 and 198 Because an Alleged Failure to Pay a Commission is not a "Deduction."

Plaintiff's second cause of action for "violations of Section 193 and 198 of New York Labor Law" is predicated on PrinterOn's alleged "fail[ure] to pay 'wages.'"  Compl. ¶ 49.  Yet neither NYLL § 193—which concerns inappropriate "deductions from wages"—nor NYLL § 198—a remedies provision—provides a proper basis for Plaintiff's claims, which are based on PrinterOn's alleged wholesale withholding of certain commission payments.  As discussed below, courts in this District routinely dismiss NYLL § 193 claims that concern a failure to pay wages rather than an improper deduction from wages.  Plaintiff has presented zero evidence of, and fails to make any allegations regarding, PrinterOn's wrongful deduction of wages, and his NYLL § 193 claim is a clear attempt to recover additional damages under NYLL that are unavailable through his other claims.  Plaintiff's second cause of action should therefore be dismissed as a matter of law.

NYLL § 193 governs deductions from employee wages and states that "[n]o employer shall make deductions from the wages of any employee, except deductions which . . . are made in accordance with the provisions of any law . . . or . . . are for the benefit of the employee." NYLL § 193(1)(a)-(b).  The statute provides a list of permitted deductions, such as for insurance premiums and transit passes.  *Id.*  To assert a viable claim under NYLL § 193, Plaintiff must allege a specific deduction from wages, not wholesale failure to pay a certain wage.  *See, e.g.*, *Goldberg v. Jacquet*, 667 F. App'x 313, 314 (2d Cir. 2016).

As explained by the Second Circuit:

> In order to state a claim for a violation of NYLL § 193, a plaintiff must allege a specific deduction from wages and not merely a failure to pay wages.  A 'deduction' is more targeted and direct than the wholesale withholding of wages and New York courts recognize that the purpose of section 193 is to place the risk of loss for such things as damaged or spoiled merchandise on the employer rather than the employee.

*Id.* (citations and internal quotation marks omitted).

As Your Honor explained in *Malinowski v. Wall St. Source, Inc.*:  "[T]he majority, and more persuasive, interpretation of § 193 is that it 'has nothing to do with failure to pay wages or severance benefits, governing instead the specific subject of making deductions from wages.'" No. 09 CIV. 9592 PAE, 2012 WL 279450, at *3 n.5 (S.D.N.Y. Jan. 31, 2012) (quoting *Monagle v. Scholastic, Inc.*, No. 06 CIV. 14342 GEL, 2007 WL 766282, at *2 (S.D.N.Y. Mar. 9, 2007)).

Plaintiff's cause of action is based on PrinterOn's alleged failure to pay certain commission fees he claims he was contractually entitled to receive under his Commission Plans, not wrongful deductions made from his wages, and it is therefore outside the ambit of NYLL § 193.  *Goldberg*, 667 F. App'x at 314.  Courts in this District have routinely dismissed NYLL § 193 claims that are indistinguishable from Plaintiff's because they concern a failure to pay wages, rather than a deduction of wages. *See id.*; *Komlossy v. Faruqi & Faruqi, LLP*, No. 15 Civ. 9316 (KPF), 2017 WL 722033, at *14 (S.D.N.Y. Feb. 23, 2017), *aff'd*, 714 F. App'x. 11 (2d Cir. 2017) ("[E]ven if the Jefferies Fee Commission were to qualify as a 'wage,' Defendants' nonpayment constitutes a failure to pay the wage, not a 'deduction' of the wage in violation of § 193."); *Gold v. Am. Med. Alert Corp.*, No. 14 Civ. 5485 JFK, 2015 WL 4887525, at *2 (S.D.N.Y. Aug. 17, 2015) ("Plaintiff has not pled 'any deduction' from wages because the deduction Plaintiff claims is merely the total withholding of wages, which is the essence of the

breach of contract claim. Section 193 requires something more:  a specific instance of docking the employee's pay.  Because Gold only pleads a total withholding, his second claim must be dismissed.").

Plaintiff's NYLL § 198 claims must also fail because NYLL § 198 is a remedies provision, and cannot serve as an independent cause of action separate from a substantive violation of the NYLL.  *See, e.g.*, *Malinowski*, 2012 WL 279450, at *3.

Plaintiff has presented zero evidence of, and fails to make any allegations regarding, PrinterOn's wrongful deduction of wages.  His second cause of action must therefore be dismissed as a matter of law.

**B.      Plaintiff's Claim for Commissions Owed on the August 12, 2012 Docomo Invoice is Barred by New York's Six-Year Statute of Limitations.**

Breach of contract claims are subject to a six-year statute of limitations.  CPLR § 213(2). Under New York law, "it is well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered."  *ABB Indus. Sys., Inc. v. Prime Tech, Inc.*, 120 F.3d 351, 360 (2d Cir. 1997); *see also V.E.C. Corp. of Delaware v. Hilliard*, 896 F. Supp. 2d 253, 260 (S.D.N.Y. 2012); *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (N.Y. 1993).  Where "the claim is for payment of a sum of money allegedly owed pursuant to a contract, the cause of action accrues when the [party making the claim] possesses a legal right to demand payment." *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 18 N.Y.3d 765, 770 (N.Y. 2012).  Thus, the statute of limitations is "triggered when the party that was owed money had the right to demand payment, not when it actually made the demand."  *Id.* at 771.

Plaintiff's claims concerning Docomo, one of the primary accounts at issue, stem from an alleged breach of the 2013 Commission Agreement, which was executed on June 22, 2012.  (*Id.*

14

¶ 17, 22.)  The Docomo contract for $1 million was invoiced—the event that triggers a salesperson's entitlement to commissions—on or around August 12, 2012.  (*Id.* ¶ 50.)  Plaintiff did not file his Summons with Notice in New York State Court until November 1, 2018, more than six years after PrinterOn allegedly breached the 2013 Commission Agreement.  (*Id.* ¶ 86.)  Thus, Plaintiff's claim related to Docomo is time-barred.

### C.   Plaintiff Has Produced No Evidence to Support his Breach of Contract Claim.

To state a breach of contract claim under New York law, a plaintiff must allege:  "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  *Bader v. Wells Fargo Home Mortg., Inc.*, No. 09 Civ. 9410 PAE, 2012 WL 1428898, at *3 (S.D.N.Y. Apr. 25, 2012) (quoting *Johnson v. Nextel Commc'ns Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).  At the summary judgment phase, dismissal is proper for a breach of contract claim for failure to pay commissions if plaintiff fails to produce evidence of improperly withheld commissions.  *Id.*

Plaintiff has not produced any evidence to support his breach of contract claim. Specifically, there is evidentiary support for Plaintiff's argument that PrinterOn failed to perform under the terms of his Employment Agreement or Commission Plans.

In his Complaint and throughout this litigation, Plaintiff has been overtly vague in his allegations, particularly regarding the customer accounts on which he believes PrinterOn failed to pay him commissions.  Compl. ¶¶ 41-45.  The only two specific theories Plaintiff has proffered are that:  (1) under the 2013 Commission Plan, Plaintiff was entitled to commission on the $1 million Docomo Pre-Payment Agreement; and (2) at the time of his termination, Plaintiff was entitled to additional commissions on accounts that he "consummated," but that PrinterOn did not invoice prior to his termination.  (*Id.* ¶¶ 30-31, 39; Pl.'s Oct. 9, 2019 Pre-Motion Letter at

1-2 (ECF No. 43)).  Both arguments are clearly flawed under the express terms of the applicable

agreements and Plaintiff's breach of contract claim should be dismissed.

      1.      **Plaintiff is Not Entitled to Commissions for the $1 Million Docomo Pre-Payment Agreement.**

There is no evidence to support Plaintiff's claim that he was entitled to commissions for

the Docomo Pre-Payment Agreement.  To the contrary, the express language of the 2013

Commission Plan and the Employment Agreement, as well as all of the relevant evidence

produced, prove that Plaintiff was not entitled to these commissions.

During negotiations for Plaintiff's Employment Agreement, Noreikis explicitly told

Plaintiff that the 2013 Commission Plan excluded commissions related to the Docomo Pre-

Payment Agreement.  (SOF ¶¶ 35-42.)  Therefore, the 2013 Commission Plan's only reference to

Docomo concerns expanding the Docomo relationship to its corporate affiliates.  (*Id.* ¶ 48.)

Consistent with the 2013 Commission Plan, Dreni's responsibility during fiscal year 2013 was to

grow PrinterOn's relationship with Nomadix and NTT Docomo.  (*Id.*  ¶ 49.)  Furthermore, when

the parties discussed the calculation of Dreni's commissions for the year, Dreni admitted on

multiple occasions that the Docomo Pre-Payment Agreement was not intended to be included in

his commission calculations. (*Id.* ¶¶ 53-57.)

The only rational interpretation of the 2013 Commission Plan requires excluding

commissions for the Docomo Pre-Payment Agreement, considering:  (1) the work to secure the

Docomo Pre-Payment Agreement began in early 2011, months before Plaintiff was hired; (2)

Docomo executed the Letter of Intent for the Docomo Pre-Payment Agreement in February

2012, months before Plaintiff's hire; (3) PrinterOn had already accounted for the commissions

from the Docomo Pre-Payment Agreement before Plaintiff was hired; and (4) it would be

illogical to give Dreni commissions on the Docomo Pre-payment when PrinterOn knew a $1

million deal would close, with no assistance from Dreni, soon after his hire.  (*Id.* ¶¶ 31-32, 39, 41.)

Plaintiff has produced zero evidence to support his position that the 2013 Commission Plan included commissions under the Docomo Pre-Payment Agreement.  He cannot simply rewrite the terms of his 2013 Commission Plan now that PrinterOn has terminated him, and his breach of contract claim should be dismissed as it relates to the Docomo account.

> **2.     According to Plaintiff's Employment Agreement, He is Not Entitled to Post-Termination Commissions for Any Sale that was Not Invoiced Prior to his Termination.**

Plaintiff's assertion that he is entitled to post-termination commissions for sales not yet invoiced has no basis in his Employment Agreement or Commission Plans.

When PrinterOn terminated Plaintiff on January 4, 2018, it provided a Termination Letter that specifically detailed the outstanding commissions he would receive.  Plaintiff does not challenge PrinterOn's calculations for the commission payments he already received, nor does he assert that PrinterOn failed to pay him commissions for any invoiced account.  Rather, Plaintiff argues that he is entitled to commissions for revenue on certain accounts not yet invoiced before his termination.  (ECF No. 43 Pl.'s Oct. 9, 2019 Pre-Motion Letter at 1-2.)  Plaintiff's position directly contradicts the express terms of his Employment Agreement and Commission Plan.

The Employment Agreement provided that upon Plaintiff's termination, Plaintiff was entitled to "applicable outstanding commissions up to the date of his termination."  (SOF ¶ 60) The 2017 Commission Plan, which governed Plaintiff's commission calculations during the pertinent time period, stated that commissions for Plaintiff were calculated based on "invoiced sales."  (*Id.* ¶ 61.)  Therefore, PrinterOn only owed Plaintiff commissions if it invoiced the sale.

During negotiations over Plaintiff's Employment Agreement, Plaintiff requested that the Employment Agreement be amended to provide for commission payments "earned up to that

point and/or scheduled to be paid in the next 6 months [after termination.]," but PrinterOn rejected this request and did not include it in the final Employment Agreement.  (*Id.* ¶ 62.)

In *Graff v. Enodis Corp.*, No. 02 CIV. 5922 (JSR), 2003 WL 1702026, at *1 (S.D.N.Y. Mar. 28, 2003), the court dismissed a cause of action similar to Plaintiff's.  In *Graff*, the company compensated the plaintiff through sales commissions.  *Id.*  After his termination, plaintiff filed suit, claiming that the employer failed to pay him commissions for sales he made prior to his termination.  *Id.*  Specifically, plaintiff argued it was his "understanding" that commissions were "earned" at the time an order was placed, and he sought to recover commissions on sales that were placed before his termination.  *Id.*  The court dismissed plaintiff's claim at the summary judgment stage because a policy bulletin sent to plaintiff stated that "commissionable values" would be determined based on "net sales value for equipment actually shipped and invoiced."  *Id.*  The Court explained that, per the policy bulletin, "[t]he only reasonable reading of this language is that commissions are earned when orders are shipped and the customer is invoiced, with payment made the following month."  *Id.* at *2.

The Southern District of New York similarly granted summary judgment for the employer in *Simas v. Merrill Corp.* where plaintiff claim for post-resignation commissions turned on when commissions were deemed "earned."  No. 02 CIV.4400 RCC, 2004 WL 213013, at *4 (S.D.N.Y. Feb. 4, 2004).  In *Simas*, plaintiff argued that he was entitled to post-resignation commissions for all sales.  *Id.* at *3.  The court dismissed plaintiff's claim, finding that although the term "earned commission" was undefined in the plaintiff's commission plan, it called for commission calculations based on "collected revenue."  *Id.*

Plaintiff cannot revise his Employment Agreement to include a term that was explicitly rejected.  There is no evidence to indicate that Plaintiff was not paid commissions for any

invoiced accounts, and his breach of contract claim should be dismissed.

### D. Plaintiff Accepted a $155,769.23 Severance Payment and Thus Waived His Right to Sue PrinterOn.

"Courts applying New York law will enforce valid releases that are clear and unambiguous on their face and which were knowingly and voluntarily entered into and were not 'the product of fraud, duress, or undue influence.'" *Hummel v. AstraZeneca LP*, 575 F. Supp. 2d 568, 570 (S.D.N.Y. 2008) (citation omitted).  Under the Employment Agreement, Plaintiff's acceptance of the $155,769.23 lump sum severance payment constituted a release barring his claims in the instant suit.

Articles 4.1(A)-(E) of the Employment Agreement described the compensation due to Plaintiff upon his termination, which varied based on the reason for the termination or resignation.

The extent of the release was dependent upon the severance payment Plaintiff accepted. In part, Article 4.3 of the Employment Agreement stated:

> Upon payment of the amounts due upon termination of employment under the applicable subsection 4.1 B-E, . . . the Employee shall have no claim against the PrinterOn Group for damages, termination pay, severance pay, pay in lieu of notice of termination, statutory or otherwise, except in respect of payment of remuneration earned, due and owing to the effective date of termination and the right to dispute whether the termination was for Cause.

This clause provided a general release and automatically waived Plaintiff's claims against PrinterOn—"except in respect of payment of remuneration earned, due and owing to the effective date of termination and the right to dispute whether the termination was for Cause"— if he was properly terminated and compensated under Article 4.1(B)-(E).

19

Subsequently, Article 4.3 required that Plaintiff enter into a more extensive release of claims in the event he was paid severance that exceeded any "applicable legislation."  The provision stated:

> The payment of any amounts by the Corporation in excess of any amounts owing to the Employee pursuant to applicable legislation and arising as a result of the termination of the Employee's employment are conditional upon the execution by the Employee of a full and final release of all claims and possible claims, as well as an indemnity for the Employee's taxes, in favor of the PrinterOn Group and its shareholders directors, officers and employers in a form acceptable to the Corporation.

When PrinterOn terminated Plaintiff, he received a severance payment exceeding amounts owed under applicable legislation.  Specifically, PrinterOn paid Plaintiff:  (1) $49,842.33 for all outstanding commissions and pre-approved expenses, which represented the amount due to Plaintiff under applicable legislation; and (2) a $155,769.23 lump sum severance payment for 36 weeks of additional salary, which went beyond any amount owed to Plaintiff under any applicable legislation.  Plaintiff was therefore required to release PrinterOn of "all claims and possible claims."

When PrinterOn terminated Plaintiff, it provided him a Termination Letter with an attached release that required Plaintiff to sign and return the release without any modification.  Although Plaintiff accepted the $155,769.23 lump sum severance payment, he did not execute the release.

Courts in this District have found that the acceptance of a severance payment can constitute a full satisfaction of all claims under a similar employment agreement.  In *Volk v. Liggett Grp. Inc.*, then District Judge Sotomayor found that an employee waived all claims against an employer when he accepted a severance payment from that employer, where his employment agreement stated that "[a]ny payments received by Employee under this Agreement

that are attributable to the termination of Employee's employment shall be in full and complete satisfaction of any and all claims Employee may have against the Employer."  No. 96 CIV. 1921 (SS), 1997 WL 107458, at *1-2, *5 (S.D.N.Y. Mar. 11, 1997) (citations omitted).

Like the plaintiff in *Volk*, Plaintiff agreed that the acceptance of his severance payment would require him to waive all future claims against PrinterOn.  The terms of the Employment Agreement therefore require that all of his claims be dismissed.

> ### E. Plaintiff's Breach of the Covenant of Good Faith and Fair Dealing is Redundant to Plaintiff's Breach of Contract Claim and Should Be Dismissed.

A claim for breach of the implied covenant of good faith and fair dealing must be dismissed when the conduct allegedly violating the implied covenant is also the predicate for a breach of contract claim.  *Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393 (RJS), 2010 WL 2813632, at *17 (S.D.N.Y. July 12, 2010), *aff'd*, 423 F. App'x 102 (2d Cir. 2011).  Here, Plaintiff alleges he "did not receive the proper amount of commission compensation, despite having performed all work contractually required of him to earn the same" (Compl. ¶ 55), which merely rehashes his breach of contract claim.  Additionally, Plaintiff has not proffered any evidence of bad faith on PrinterOn's part, which is fatal to his claim at the summary judgment stage.  *See CCM Rochester, Inc. v. Federated Inv'rs, Inc.*, 234 F. Supp. 3d 501, 510 (S.D.N.Y. 2017) ("Plaintiff's lack of any evidence of bad faith is fatal to its claim that [defendant] breached the implied covenant of good faith and fair dealing.").

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is redundant as to his breach of contract claim, and should be dismissed.

## II. PRINTERON IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM BECAUSE PLAINTIFF BREACHED HIS EMPLOYMENT AGREEMENT BY FAILING TO EXECUTE THE REQUIRED RELEASE.

PrinterOn is entitled to summary judgment on its breach of contract counterclaim (its

fourth cause of action) because there is no genuine issue of material fact that Plaintiff breached his Employment Agreement through accepting the lump sum severance payment and failing to execute a "full and final release of all claims and possible claims" in PrinterOn's favor.

To state a breach of contract claim under New York law, the moving party must establish:  "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson*, 660 F.3d at 142 (2d Cir. 2011) (citations omitted).  On a breach of contract claim, summary judgment is properly granted "[w]here the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 345 (S.D.N.Y. 2009) (quoting *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 98 (2d Cir. 1996)).  A moving party is entitled to summary judgment on a breach of contract claim if it establishes that there is no issue of material fact.

The Employment Agreement unambiguously required Plaintiff to execute a "full and final release of all claims and possible claims, as well as an indemnity for Employee's taxes, in favor of the PrinterOn Group and its shareholders, directors, officers and employers in a form acceptable to [PrinterOn]" if Plaintiff was paid "any amounts by [PrinterOn] in excess of any amounts owing to the [Plaintiff] pursuant to applicable legislation" upon his termination.  (SOF ¶ 82.)  It is undisputed that PrinterOn performed under the contact; it paid Plaintiff a $155,769.23 lump sum severance payment comprised of 36 weeks' additional salary, which exceeded any amount PrinterOn owed to Plaintiff under any applicable legislation.  (*Id.* ¶ 69.)  It is also undisputed that Plaintiff breached the Employment Agreement by accepting the severance payment without executing the release that PrinterOn enclosed with Plaintiff's Termination Letter.  (*Id.* ¶¶ 82-85.)  Relying on the express terms of the Employment Agreement, PrinterOn

made such conditional payment with the reasonable expectation that Plaintiff would sign a valid release of all claims.  PrinterOn suffered damages by paying Plaintiff $155,769.23 and not receiving the benefit of a signed release, which would have prevented the instant lawsuit.

New York federal and state courts have consistently granted summary judgment in a variety of contexts, where the contract terms are similarly clear and unambiguous.  *See, e.g.*, *Axginc Corp. v. Plaza Automall, Ltd.*, 759 F. App'x. 26, 28-30 (2d Cir. 2018) (granting sublessor's motion on its breach of contract claim for unpaid rent, late fees, and interest and on sublessee's counterclaims, where sublessee conceded it failed to pay rent due under the parties' sublease and its defenses were either barred by or contrary to specific sublease terms); *Kosher Sports, Inc. v. Queens Ballpark Co., LLC*, 513 F. App'x 106, 108-09 (2d Cir. 2013) (affirming stadium operator's motion on breach of contract counterclaim and dismissing plaintiff's breach of contract claim, where operative contract's unambiguous terms did not grant plaintiff certain alleged rights in its food sales at stadium and plaintiff failed to make required payments under contract); *Resurgence Asset Mgt., LLC v. Gidumal*, 176 A.D.3d 520, 520-21 (1st Dep't 2019) (granting employer's motion, where termination agreement explicitly subjected defendant's compensation payment to clawback obligations, employer fully performed in paying amounts owed under contract, and defendant breached contract through failing to repay clawback share); *World Auto Parts, Inc. v. Labenski*, 217 A.D.2d 940, 940 (4th Dep't 1995) (granting employer's motion and finding defendant breached retirement agreement's non-compete provisions, where employer showed defendant attended trade shows, distributed business cards, informed competitors of plans to re-enter business after non-compete expired, made personal loans to competitors' principal owners, and divulged confidential price information to competitors).

The terms of Plaintiff's Employment Agreement are clear and unambiguous.  Plaintiff was required to sign the release PrinterOn provided to him, in exchange for the $155,769.23 lump sum severance payment PrinterOn paid to him.  Plaintiff never executed the release and instead initiated this current lawsuit, which is a clear breach of his Employment Agreement.  For the foregoing reasons, and consistent with previous rulings, this Court should grant PrinterOn's motion for summary judgment as to its breach of contract counterclaim.

## **CONCLUSION**

For the foregoing reasons, PrinterOn respectfully requests that this Court grant its motion for summary judgment.

Dated:  December 12, 2019
        New York, New York

Respectfully Submitted,

DRINKER BIDDLE & REATH LLP


By:    */s/ Tracey Salmon-Smith*
      Tracey Salmon-Smith
      Lucas B. Michelen
      1177 Avenue of the Americas, 41st Fl.
      New York, New York  10036
      (212) 248-3140
      tracey.salmonsmith@dbr.com
      lucas.michelen@dbr.com

*Attorneys for Defendant/Counterclaim Plaintiff*
*PrinterOn America Corporation*