USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_09/14/2020__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DENIS DRENI,

                    Plaintiff,

          -against-

PRINTERON AMERICA CORPORATION,

                    Defendant.

1:18-cv-12017-MKV

OPINION AND ORDER
GRANTING IN PART
AND DENYING IN PART
MOTIONS FOR
SUMMARY JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

        Plaintiff Denis Dreni brought this action against Defendant PrinterOn America Corporation ("PrinterOn"), his former employer, to recover unpaid commissions under his employment contract following his termination from the company.  Pending before the Court is a motion for summary judgment by PrinterOn and a motion for partial summary judgment by Dreni.  For the reasons discussed below, PrinterOn's motion for summary judgment is GRANTED IN PART AND DENIED IN PART and Dreni's motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART.

## I.      BACKGROUND

### A.  Factual Background

#### 1.  The Employment Agreement and Commission Plans

        At its essence, this is a contract dispute that arose after PrinterOn, a cloud-based printing company, fired one if its high-level salespersons, Dreni.  In early May 2012, a mutual acquaintance introduced Dreni to Kenneth Noreikis, Vice President of Sales and Marketing for PrinterOn, who then broached a potential employment opportunity for Dreni to PrinterOn.  (Pl.'s Resp. Def.'s

56.1 ¶¶ 5, 13 [ECF No. 57].)[1]   After weeks of negotiations regarding terms of employment, PrinterOn hired Dreni as Director of Strategic Alliances & Enterprise Accounts.  (*Id.* ¶¶ 15–16; Jt. 56.1 ¶ 5 [ECF No. 49].)[2]   On June 22, 2012, Dreni and PrinterOn CEO and President Angus Cunningham executed Dreni's employment agreement ("Employment Agreement"), which the parties agreed would be governed by New York law, as well as a Proprietary Information and Invention Agreement.  (Jt. 56.1 ¶¶ 6–8.)

Under the Employment Agreement, Dreni was entitled to a base salary and "commission based upon sales revenue procured in [his] assigned market space."  (Jt. 56.1 Ex. 1 [ECF No. 49-1].)  The Employment Agreement provided for commissions based on both personal sales and company sales.  Dreni's commission payments were governed by separate commission plans that PrinterOn issued each year beginning with the Fiscal 2013 Commission Plan ("2013 Commission Plan").  (Jt. 56.1 ¶¶ 11–12.)  Under the 2013 Commission Plan and subsequent plans, Dreni's commissions were contingent on his "Annual Personal Quota" (personal sales performance) and the "Annual Company Target" (company sales performance).  (Jt. 56.1 Ex. 1.)  The "Annual Personal Quota" section of the 2013 Commission Plan states, "$1,000,000 net new revenue in your Target Market. . . .  All hardware, software, training and services revenue will count toward my annual quota."  (*Id.*)  The "Annual Company Target" section states, "$5,200,000 Revenue for each fiscal year ended April 30."  (*Id.*)  The "Variable Compensation on Annual Personal Quota" section provides that Dreni would earn "4.5% of net new subscription revenue on net new subscriptions in [his] Target Market up to the first $1,000,000 of [his] Annual Personal Quota" and 5.63% of

---

[1] Citations to "Pl.'s Resp. Def.'s 56.1" are references to Plaintiff Dreni's response to Defendant PrinterOn's 56.1 statement [ECF No. 57].

[2] Citations to "Jt. 56.1" are references to the parties' joint 56.1 statement [ECF No. 49].

revenue on subscriptions over $1,000,000.  (*Id.*)  Finally, the "Variable Compensation on Annual Company Target" section provides that Dreni would earn a set amount of dollars for each revenue milestone PrinterOn achieved.  (*Id.*)  The plans that followed the 2013 Commission Plan were structured similarly.  (*See generally* Jt. 56.1 Exs. 2–5 [ECF Nos. 49-2–5].)

### 2. The Docomo Account

Among the accounts serviced by Dreni while he was employed at PrinterOn was Docomo interTouch Pte. Ltd. ("Docomo"), an internet service provider for hotels in the Asia-Pacific region. (Pl.'s Resp. Def.'s 56.1 ¶ 30.)  The 2013 Commission Plan lists Docomo under Dreni's "Duties and Responsibilities" with the description, "Expand relationship to Nomadix and NTT Docomo (parent)."  (Jt. 56.1 Ex. 1 [ECF No. 49-1].)  PrinterOn aimed to extend its existing relationship with Docomo to Nomadix, a hardware manufacturing division of Docomo, and NTT Docomo, Docomo's parent company.  (*Id.* ¶¶ 43–47.)

In February 2012, four months before Dreni was hired, PrinterOn and Docomo signed a letter of intent regarding a $1 million reseller and distributor agreement.  (Pl.'s Resp. Def.'s 56.1 ¶¶ 30–31.)  The letter states that "[u]pon execution of the Reseller and Distribution Agreement Docomo interTouch shall pay to PrinterOn a one-time sum of US$1,000,000 for the 7,500 annual PrinterOn subscriptions."  (Salmon-Smith Decl. Supp. Ex. H [ECF No. 52-8].)[3]  Between March 2012 and June 22, 2012, the date Dreni was hired, PrinterOn and Docomo negotiated the terms of the agreed upon $1 million purchase of PrinterOn subscriptions.  (Pl.'s Resp. Def.'s 56.1 ¶ 34.)

The parties agree that the $1 million Docomo deal, or pre-payment, did not count towards Dreni's personal sales quotas but disagree whether it should have counted towards his company

---

[3] Citations to "Salmon-Smith Decl. Supp." are references to the declaration of Tracey Salmon-Smith in support of PrinterOn's motion for summary judgment [ECF No. 52].

target quota.   The Docomo pre-payment was discussed during the negotiations of Dreni's Employment Agreement.   Noreikis e-mailed Dreni a "model for his compensation plan," which lists Docomo under Dreni's initial personal accounts with the note "pre-payment does not apply to company target."  (Salmon-Smith Decl. Supp. Exs. O–P [ECF Nos. 52-15–16].)   When Dreni asked, "Why are we leaving out any prepayment from Docomo from the company number?," Noreikis responded that it was "not in the budget" but "the hardware that will ship to support the subscriptions will apply to your personal and company number."  (Salmon-Smith Decl. Supp. Ex. E [ECF No. 52-5].)   In deposition testimony, Noreikis recalled:

> I had a material project that was going to close, was likely going to close with Docomo.  I didn't know if the [Docomo] contract was going to sign days before [Dreni] started or two days after he started, and that for purposes of compensation plan, the million dollar project at Docomo would not accrue to a sales compensation for either the personal number or the company number.

(Salmon-Smith Supp. Decl. Ex. I 87:11–19 [ECF No. 52-9].)

On August 12, 2012, two months after Dreni was hired, PrinterOn issued a $1 million invoice to Docomo for 7,500 pre-paid software licenses.  (Salmon-Smith Decl. Supp. Ex. R [ECF No. 52-18].)   Shortly thereafter PrinterOn received from Docomo an executed agreement in which Docomo agreed to pre-pay $1 million for the rights to redistribute a set number of PrinterOn subscriptions.  (Salmon-Smith Decl. Supp. Exs. S–T [ECF Nos. 52-19–20].)

Discussions between Dreni and PrinterOn about commissions from the Docomo pre-payment continued after the deal was finalized.  In a January 2013 e-mail sent to Noreikis, Dreni stated, "it is not fair that the company number, now, suddenly becomes complicated.  I agreed with you, that Docomo will not be part of my company number."  (Salmon-Smith Decl. Supp. Ex. X [ECF No. 52-24].)   In addition, in a May 2013 e-mail chain with Noreikis, Dreni stated, "I am not asking to be paid commission on the 1 million dollar Docomo order.  This has nothing to do with

4

my personal number.  This has only to do with my company number," and "**I am NOT asking** for you to include the Docomo number as part of my FY13 commission benefit. . . . (it is not in my contract btw, I never thought it was.  On the contrary Docomo was part of my targeted accounts." (Salmon-Smith Decl. Supp. Ex. W [ECF No. 52-23].)  Noreikis again told Dreni that he would not receive commissions on the $1 million Docomo pre-payment.  (Salmon-Smith Decl. Supp. Ex. Y [ECF No. 52-25].)

### 3.  Dreni's Termination

On January 4, 2018, PrinterOn terminated Dreni.  (Jt. 56.1 ¶ 17.)[4]  Section 4.1(D) of the Employment Agreement provides that upon termination, Dreni would be paid "any applicable outstanding commissions up to the date of such termination."   (Jt. 56.1 Ex. A.)   Upon his termination, PrinterOn provided Dreni with a termination letter that detailed two payments Dreni received: (1) $49,842.33 representing salary due, commissions on orders not yet processed, and other items; and (2) $155,769.23 representing a lump sum severance payment for an additional thirty-six weeks of salary.  (Jt. 56.1 Ex. 6 [ECF No. 49-6].)

The Employment Agreement also contains the following "Release of Claims" provision:

> Upon payment of the amounts due upon termination of employment under the applicable Subsection 4.1 B – E, . . . the Employee shall have no claim against the PrinterOn Group for damages, termination pay, severance pay, pay in lieu of notice of termination, statutory or otherwise, except in respect of payment of remuneration earned, due and owing to the effective date of termination and the right to dispute whether the termination was for Cause. The payment of any amounts by the Corporation in excess of any amounts owing to the Employee pursuant to applicable legislation and arising as a result of the termination of Employee's employment are conditional upon the execution by the Employee of a full and final release of all claims and possible claims, as well as an indemnity for the Employee's taxes, in favour of the PrinterOn Group and its shareholders, directors, officers and employers in a form acceptable to the Corporation.

---

[4] The Employment Agreement provides that PrinterOn could terminate Dreni at any time with cause or for any reason upon providing a lump sum severance payment. (Jt. 56.1 Ex. A.) In this lawsuit, Dreni does not contest his termination.

(Jt. 56.1 Ex. 1.)  Dreni did not execute the "Waiver and General Release" PrinterOn sent to him after his termination.  (Jt. 56.1 ¶ 20.)

### 4.  The PrinterOn Laptops

When Dreni was terminated, PrinterOn asked him to return all company property.  (Jt. 56.1 ¶ 21.)  At the time, Dreni had two PrinterOn laptops in his possession.  (*Id.* ¶ 22.)  Dreni gave the laptops to his attorneys for safekeeping in October 2018 while the parties negotiated protocols for Dreni to extract personal information from the laptops.  (*Id.* ¶ 23.)  In May 2019, Dreni sent the laptops to a third-party vendor selected by PrinterOn pending agreement on extraction protocols.  (*Id.* ¶ 24.)  The vendor then conducted forensic indexing to retrieve information regarding files and other data.  (Pl.'s Obj. Def.'s Resp. Pl.'s 56.1 ¶¶ 29–30 [ECF No. 83].)[5] PrinterOn incurred a fee of $5,381.25 for the forensic indexing vendor composed of two separate expenses: (1) $3,131.52 of "professional services," including the vendor's out-of-pocket expenses (Salmon-Smith Decl. Supp. Ex. L [ECF No. 74-12]); and (2) $2,250 in "storage" costs at a rate of $250 per month (Salmon-Smith Decl. Supp. Ex. M [ECF No. 74-13]).

## B.  Procedural Background

Dreni commenced this action on November 1, 2018, in New York Supreme Court, New York County.  (Notice Removal Ex. A [ECF No. 1-1].)  PrinterOn timely removed the case to the Southern District of New York.  (Compl. [ECF No. 7].)  Dreni seeks damages for PrinterOn's failure to pay him commissions to which he claims he is contractually entitled.  (*Id.* ¶ 5.)  Dreni alleges that he was wrongfully denied commissions on various accounts under the Employment Agreement and the commission plans, including the Docomo account (*id.* ¶¶ 42–43), and, more

---

[5] Citations to "Pl.'s Obj. Def.'s Resp. Pl.'s 56.1" are references to Dreni's objections to PrinterOn's response to Dreni's 56.1 statement [ECF No. 83].

specifically, that he was denied commissions on "maintenance-related revenue" on his accounts (Dreni Decl. Supp. ¶¶ 2–3 [ECF No. 61]).[6]

Dreni's complaint alleges three causes of action: (1) breach of contract; (2) violation of New York Labor Law ("NYLL") §§ 193 and 198; and (3) breach of the implied covenant of good faith and fair dealing.  (Compl. ¶¶ 41–57.)  PrinterOn answered the complaint and asserted nine counterclaims against Dreni: (1) violation of the Computer Fraud and Abuse Act ("CFAA") § 1030, 18 U.S.C. § 1030; (2) conversion; (3) replevin; (4) breach of contract with respect to the Employment Agreement; (5) breach of contract with respect to the Proprietary Information and Invention Agreement Dreni signed; (6) promissory estoppel; (7) unjust enrichment; (8) quantum meruit; and (9) breach of the covenant of good faith and fair dealing.   (Answer & Countercls. ¶¶ 37–92 [ECF No. 11].)   PrinterOn's counterclaims arise out of two factual assertions: (1) Dreni wrongfully retained two company laptops after his termination; and (2) Dreni released any claims against PrinterOn when he accepted the severance payment.  (*See id.* ¶¶ 21–36.)

## II.     THE PARTIES' MOTIONS

Both parties have moved for summary judgment on different issues and claims.

### A. PrinterOn's Motion for Summary Judgment

PrinterOn has moved for summary judgment seeking dismissal of the entire case on the ground that Dreni released all claims against PrinterOn by accepting the severance payment.

---

[6] Citations to "Dreni Decl." are references to Dreni's declaration in support of his motion for partial summary judgment [ECF No. 61].

(Def.'s Mot. 2, 19–21 [ECF No. 53].)[7]  In the alternative, PrinterOn moves for partial summary judgment on its counterclaim for breach of contract on the ground that Dreni failed to execute the release of claims after receiving the severance payment.  (*Id.* at 21–24.)  PrinterOn also moves for partial summary judgment dismissing Dreni's claims under NYLL §§ 193 and 198 for failure to state a claim (*id.* at 12–14) and Dreni's good faith and fair dealing claim on the ground that it is duplicative of his breach of contract claim (*id.* at 21).  Significantly, no motion addresses Dreni's breach of contract claim, and the parties agree that that claim is ripe for trial.  PrinterOn, however, also seeks partial summary judgment dismissing Dreni's claim for compensation with respect to the Docomo account on the grounds that it is untimely and that Dreni is not entitled to commissions on that account under the Employment Agreement and the 2013 Commission Plan.  (*Id.* at 14–19.)

In support of its motion, PrinterOn filed a statement of undisputed facts pursuant to Local Rule 56.1 (Def.'s 56.1 [ECF No. 51]) and several exhibits including excerpts from deposition transcripts of PrinterOn executives, e-mail correspondence between Dreni and PrinterOn executives and among PrinterOn executives, excerpts from Docomo Inc.'s 2011 Annual Report filed with the U.S. Securities and Exchange Commission, the June 2012 Compensation Model for Dreni, PrinterOn's Billing Summary for April 2012 through October 2018, and Dreni's Fiscal Year 2013 Commission Summary (*see* Salmon-Smith Decl. Supp.).

### B.  Dreni's Motion for Partial Summary Judgment

Dreni's motion for partial summary judgment raises two arguments.  First, Dreni seeks partial summary judgment on his breach of contract claim on the ground that under the terms of the Employment Agreement, he was entitled to commissions for "maintenance revenue" in

---

[7] Citations to "Def.'s Mot." are references to PrinterOn's memorandum of law in support of its motion for summary judgment [ECF No. 53[.

connection with accounts he serviced.  (Pl.'s Mot. 3–5 [ECF No. 59].)[8]  Second, Dreni seeks partial summary judgment dismissing PrinterOn's first counterclaim for failure to state a claim under the CFAA.  (*Id.* at 5–7.)  In support of his motion, Dreni filed a Local Rule 56.1 statement (Pl.'s 56.1 [ECF No. 62]), a declaration (Dreni Decl. Supp.), and excerpts from deposition transcripts of PrinterOn executives (Cassubhai Decl. Supp. [ECF No. 60]).[9]

## III.   LEGAL STANDARD

### A.  Summary Judgment Standard

"Summary judgment is appropriate only when, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 69 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  A material factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The Court's role here "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  It may satisfy this burden

---

[8] Citations to "Pl.'s Mot." are references to Dreni's memorandum in support of his motion for partial summary judgment [ECF No. 59].

[9] Citations to "Cassubhai Decl. Supp." are references to the declaration of Hozaifa Cassubhai in support of Dreni's motion for partial summary judgment [ECF No. 60].

"in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted). If the moving party satisfies its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson*, 477 U.S. at 249). The opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (first quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); then quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)). Nevertheless, "if there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party that supports a finding that a material factual dispute exists, summary judgment is improper." *United Rentals (N. Am.), Inc. v. Conti Enters., Inc.*, 293 F. Supp. 3d 447, 451 (S.D.N.Y. 2018) (citing *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)).

### B. Contract Interpretation at the Summary Judgment Stage

Several claims before the Court implicate issues of contract construction. The threshold question in a contract dispute is whether the contractual terms at issue are ambiguous. *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000). This is a question of law for the court to decide. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465–66 (2d Cir. 2010) (citations omitted). Summary judgment is appropriate where contractual terms are unambiguous. *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citation omitted). Conversely, "contract claims are generally not subject to summary judgment if

the resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (citations omitted).

"Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) (internal quotation marks and citation omitted). In deciding whether contract language is ambiguous, "the court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." *Fed. Ins. Co.*, 639 F.3d at 568 (internal quotation marks and citations omitted). Where contractual language is ambiguous, "summary judgment can be granted if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Id.* at 567 (citation omitted).

## IV.    DISCUSSION

### A. PrinterOn's Motion for Summary Judgment

#### 1. Dreni's Purported Release of Claims

PrinterOn moves for summary judgment on the ground that Dreni waived his right to sue by accepting the lump sum severance payment. PrinterOn's argument is threefold: (1) the Employment Agreement contains language that any severance payment in excess of what Dreni was actually owed would be contingent on Dreni signing a release of all claims against PrinterOn; (2) PrinterOn's severance payment to Dreni was in excess of what he was actually owed; and (3) by accepting the severance payment, Dreni released his claims (notwithstanding that he never

signed the release of claims that PrinterOn sent him).   (Def.'s Mot. 19–21.)   On this basis, PrinterOn seeks dismissal of the entire case.  (*Id.* at 19.)  Alternatively, PrinterOn seeks summary judgment on its counterclaim for breach of contract, arguing that these facts show Dreni breached his contractual obligation to sign the release of claims.  (*Id.* at 21–24.)  At oral argument, PrinterOn recognized that if this argument were sustained, it would simply entitle PrinterOn to return of the severance payment it made given Dreni's failure to satisfy a condition of that payment.  (Tr. 16:11–17:2 [ECF No. 86].)[10]

The issues of whether Dreni released his claims against PrinterOn and whether Dreni breached the Employment Agreement by not executing the release of claims are not susceptible to resolution by summary judgment since they implicate disputes of fact.  First, there is a fundamental factual dispute over whether Dreni was paid more than he was owed under the Employment Agreement, and resolution of this issue hinges on the outcome at trial of Dreni's primary breach of contract claim (Compl. ¶¶ 29, 31–32, 41–45), on which neither party moved for summary judgment, as well as whether Dreni is entitled to commissions on maintenance revenue.  *See infra* Section IV.B.1.  PrinterOn argues that the lump sum severance "exceeded any amount PrinterOn owed [Dreni] under any applicable legislation" (Def.'s Mot. 22), but PrinterOn neglects to address the language requiring the payment to also be "in excess of any amounts owing to the Employee . . . *arising as a result of the termination of Employee's employment*" (Jt. 56.1 Ex. A (emphasis added)), which reasonably includes unpaid commissions and arguably severance.  Second, because there is a dispute over whether Dreni was paid more than he was owed under the Employment Agreement and commission plans, it cannot be determined whether Dreni's retention of the severance payment triggered an obligation to sign the release of claims.  PrinterOn's claim

---

[10] Citations to "Tr." are references to the transcript of the oral argument on the parties' motions [ECF No. 86].

that Dreni breached the Employment Agreement by retaining the severance payment requires PrinterOn to demonstrate, *inter alia*, that the severance payment was *in excess of* what Dreni was owed "pursuant to applicable legislation and arising as a result of the termination of [Dreni's] employment." (*Id.*) But if Dreni prevails at trial on his primary breach of contract claim, the severance payment may net out as having been *less than* what Dreni was owed under the Employment Agreement.[11]

Moreover, PrinterOn's release of claims argument raises the fact-intensive question whether the parties intended Dreni's acceptance of a severance payment in excess of what he is owed under the Employment Agreement to constitute an implied release of his right to sue PrinterOn. Significantly, the Employment Agreement does not state that retention of a severance payment would constitute a release. (*See id.*) To the contrary, it says that the payment is "conditional upon the execution" of a release (*id.*), and it is undisputed that Dreni did not execute the release (Def.'s Mot. 20; Pl.'s Resp. Def.'s 56.1 ¶¶ 85). It is well established that releases or "waivers of rights in contract will not be inferred unless the intent to waive is clear." *AM Cosmetics, Inc. v. Solomon*, 67 F. Supp. 2d 312, 318 (S.D.N.Y 1999) (citation omitted). Indeed, "[a] release will not be given effect unless it contains an explicit, unequivocal statement of a present promise to release [a party] from liability." *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir. 2001) (internal quotation marks omitted) (citation omitted). The Employment Agreement here provides no clear indication of intent that Dreni would waive claims against

---

[11] Dreni does not attempt to quantify his alleged compensatory damages, seeking only "an amount to be determined at trial." (Compl. 10.) Furthermore, the parties did not address in their briefs how Dreni's possible recovery on his breach of contract claim at trial—or the resolution of the issues concerning commissions raised in the present motions—might bear on whether the severance payment was in fact "in excess of any amounts . . . arising as a result of the termination of [Dreni's] employment." (Jt. 56.1 Ex. A.)

PrinterOn simply by accepting a severance payment.  Accordingly, PrinterOn's motion for summary judgment (or partial summary judgment) on this claim is denied.

### 2.  The Docomo Account

PrinterOn moves for partial summary judgment on Dreni's breach of contract claim to the extent it relates to amounts Dreni claims he is owed as commissions in connection with the Docomo account under the 2013 Commission Plan.  PrinterOn argues that Dreni is not entitled to these commissions for two reasons: (1) this claim is untimely, and (2) Dreni's Employment Agreement and the 2013 Commission Plan exclude the Docomo account from Dreni's commissions.  (Def.'s Mot. 14–19.)

The contracts are silent with respect to what event triggers a salesperson's entitlement to commissions.  PrinterOn claims that the invoicing of sales triggers a salesperson's entitlement to commissions (*Id.* at 15, 17; Def.'s 56.1 ¶ 61), whereas Dreni argues that a salesperson's right to commissions vests upon PrinterOn's receipt of payment from the client (Pl.'s Opp. 4–6 [ECF No. 54];[12] Pl.'s Resp. Def.'s 56.1 ¶ 61).  The 2013 Commission Plan generally speaks in terms of receipt of revenue, and Dreni's annual personal quota, annual company target, and variable compensation on these items were measured in revenue.  (Jt. 56.1 Ex. A.)  One provision, however, speaks of invoicing: "Invoiced revenue uncollected within 90 days of invoice due date will result in reversal of commissions paid, which will be deducted from future commissions."  (*Id.*)  This language suggests that salespersons might receive commission payments upon invoicing, before PrinterOn receives revenue from the client.  Discerning no clear, definite meaning from the text of the contracts, the Court finds the contractual language at issue to be ambiguous.  *Law Debenture*

---

[12] Citations to "Pl.'s Opp." are references to Dreni's memorandum of law in opposition to PrinterOn's motion for summary judgment [ECF No. 54].

*Trust Co.*, 595 F.3d at 465–66; *see also Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994) (finding contract ambiguous "[g]iven the two conflicting reasonable interpretations").

Turning to extrinsic evidence, PrinterOn's billing and compensation practices offer no clear guidance here. Each side presents conflicting accounts of how and when PrinterOn paid its salespersons commissions. When asked at a deposition how PrinterOn calculated commissions on a monthly basis, PrinterOn CEO Angus Cunningham testified that "it was off of the invoices that had been issued that month." (Salmon-Smith Decl. Supp. Ex. B 39:23–40:5.) Yet PrinterOn CFO Margaret Ritchie testified at a deposition to instances where no invoice would be issued for a sale or transaction. (Cassubhai Decl. Opp. Ex. 4 60:12–61:7 [ECF No. 56-4].)[13] A custom of a business may become part of a contract only where it is "so far established and so far known to the parties that *it must be* supposed that their contract was made in reference to it. For this purpose the custom must be established, and not casual, *uniform and not varying*, *general and not personal*, and known to the parties." *Law Debenture Trust Co.*, 595 F.3d at 466 (quoting *Belasco Theatre Corp. v. Jelin Prods., Inc.*, 270 A.D. 202, 206, 59 N.Y.S.2d 42 (1st Dep't 1945)). Based on the record on the competing motions for summary judgment, the Court cannot find that there was such a uniform or well-established practice at PrinterOn.

The issue of what triggers Dreni's entitlement to commissions is critical to the running of the statute of limitations. New York has a six-year statute of limitations for breach of contract. N.Y. C.P.L.R. §§ 203(a), 213(2). Under New York law, a cause of action for breach of contract accrues at the time of breach. *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402, 599 N.Y.S.2d 501, 615 N.E.2d 985 (1993). Where "the claim is for payment of a sum of money

---

[13] Citations to "Cassubhai Decl. Opp." are references to the declaration of Hozaifa Cassubhai in opposition to PrinterOn's motion for partial summary judgment [ECF No. 56].

allegedly owed pursuant to a contract, the cause of action accrues when the [claimant] possesses a legal right to demand payment." *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 18 N.Y.3d 765, 770, 944 N.Y.S.2d 742, 967 N.E.2d 1187 (2012) (citations omitted). Thus, if invoicing triggers commissions, then Dreni's claim would be time-barred because the Docomo contract was invoiced on August 12, 2012 (Salmon-Smith Decl. Supp. Ex. R), and Dreni filed this action on November 1, 2018 (Notice Removal Ex. A). But if PrinterOn's receipt of payment triggers commissions, then Dreni's claim would be timely because PrinterOn received payment from Docomo in December 2012. (Dreni Decl. Opp. ¶ 17 [ECF No. 64].)[14] Given the ambiguity of the contracts, the factual dispute as to what triggers a salesperson's entitlement to commissions, and the centrality of this issue to PrinterOn's statute of limitations defense, PrinterOn's motion for summary judgment on this ground is denied.

The Court also finds the contracts to be ambiguous with respect to the merits of whether Dreni is entitled to commissions in connection with the $1 million Docomo pre-payment. The 2013 Commission Plan lists Docomo under Dreni's duties and responsibilities. (Jt. 56.1 Ex. 1.) That listing, however, includes the description, "Expand relationship to Nomadix and NTT Docomo (parent)." (*Id.*) While Docomo is listed on the 2013 Commission Plan, this qualifying language could mean, as PrinterOn argues, that Dreni's connection to Docomo was limited strictly to working to extend PrinterOn's Docomo relationship to Nomadix and NTT Docomo. And as PrinterOn emphasizes, the context—specifically, how most of the work to secure the $1 million Docomo pre-payment had been completed before Dreni started at PrinterOn (*see* Def.'s Mot. 16)— suggests that the parties did not intend for Dreni to earn commissions on that deal. *See Hudson*

---

[14] Citations to "Dreni Decl. Opp." are references to Dreni's declaration in opposition to PrinterOn's motion for summary judgment [ECF No. 64].

*Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 16 Civ. 2767 (GBD), 16 Civ. 2787 (GBD), 2019 WL 1649983, at *10 (S.D.N.Y. Mar. 28, 2019) (noting that "a court need not turn a blind eye to context" when construing contractual text (citation omitted)).  The Court is thus unable to discern from the text of the 2013 Commission Plan whether Dreni is entitled to commission on the Docomo $1 million prepayment, and therefore, extrinsic evidence is properly considered

While the parties present conflicting extrinsic evidence as to what Dreni was told and what Dreni understood regarding the Docomo pre-payment and the 2013 Commission Plan, not all of that evidence is relevant or probative of the intent of the parties at the time of contracting.  The record makes clear that during the negotiations, Noreikis advised Dreni that the Docomo account would not be included as part of Dreni's commission calculations (Def.'s 56.1 ¶¶ 35–42; *see* Salmon-Smith Decl. Supp. Exs. O–P), and Dreni acknowledged multiple times that the Docomo pre-payment would be excluded from those calculations (*see* Salmon-Smith Decl. Supp. Exs. W–X; Def.'s 56.1 ¶¶ 53–57.)  Specifically, the model compensation plan that Noreikis e-mailed to Dreni lists Docomo under Dreni's personal accounts and notes, "pre-payment does not apply to company target."  (Salmon-Smith Decl. Supp. Exs. O–P.)  Dreni then inquired, "Why are we leaving out any prepayment from Docomo from the company number?," to which Noreikis responded that it was "not in the budget" but "the hardware that will ship to support the subscriptions will apply to your personal and company number."  (Salmon-Smith Decl. Supp. Ex. E [ECF No. 52-5].)

Dreni offers evidence that he understood that the Docomo pre-payment would count toward his company target.  (Pl.'s Opp. 9–10; Salmon-Smith Decl. Supp. Ex. W.)  Specifically, he points to an e-mail he sent to Noreikis upon seeing Docomo excluded from his commission payment for fiscal year 2013:

> Nothing mentioned in the contract that the docomo number will be removed from the Corporate accelerators . . . .  I am asking to be fair and be paid me [sic] on the 5.5 million company number . . . .  [P]rorating the corporate number does not [make sense] because that is what was used to convince me to come on board and we succeeded. I am asking for the accelerators to reflect the real success of PrinterOn based on the contract . . . .

(Salmon-Smith Decl. Supp. Ex. W.)  But this evidence post-dates the execution of the Employment Agreement and 2013 Commission Plan, and as such it is not relevant to what Dreni understood the contracts to mean.  Caselaw is clear on this.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 207 n.10 (2d Cir. 2005) (doubting whether the extrinsic evidence on which the district court relied—specifically, communications between the parties three years after the contract was formed—"was in any event relevant to the determination of the parties' intent at the time they entered into the contract" (citations omitted)); *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006) (noting that "unilateral expression[s] of one party's postcontractual subjective understanding of the terms of the agreement . . . [are] not probative as an aid to the interpretation of the contract" (quoting *LaSalle Bank*, 424 F.3d at 207 n.10)); *Ingersoll Milling Mach. Co. v. M/V Bodena*, 619 F. Supp. 493, 506 (S.D.N.Y. 1985) (finding that one party's subjective interpretation of the contract, which was not communicated to the other party until litigation commenced, "cannot be used to establish that [the parties] had such intent and understanding when they entered into the . . . contract" (citation omitted)).  As such, the extrinsic evidence Dreni offers does not create a triable issue of fact.  *See Wells v. Shearson Lehman/Am. Express, Inc.*, 72 N.Y.2d 11, 24, 530 N.Y.S.2d 517, 526 N.E.2d 8 (1988) ("Uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none.").

Given the context of the Docomo deal, the overwhelming evidence offered by PrinterOn demonstrating the parties' intent or understanding at the time the parties executed the Employment Agreement, and the lack of relevant extrinsic evidence offered by Dreni, the Court concludes that

there is no genuine dispute of material fact as to the meaning of the Employment Agreement and 2013 Commission Plan with respect to the Docomo pre-payment. *See Fed. Ins. Co.*, 639 F.3d at 567 (citation omitted). The parties unquestionably intended the Employment Agreement and 2013 Commission Plan to exclude the $1 million Docomo pre-payment from Dreni's commissions calculations. Accordingly, with respect to the Docomo aspect of Dreni's breach of contract claim, summary judgment is granted in favor of PrinterOn.

### 3.  Dreni's Claim Under NYLL §§ 193 and 198

PrinterOn next moves for summary judgment dismissing Dreni's claim under NYLL §§ 193 and 198. Section 193 prohibits an employer from "mak[ing] any deduction from the wages of an employee," N.Y. Lab. L. § 193, and section 198 provides remedies for employees that prevail in a wage claim, *id.* § 198. PrinterOn argues that Dreni has failed to state claim under § 193 because the alleged failure to pay commissions does not qualify as a "deduction" and, consequently, Dreni's § 198 claim fails because that section cannot support an independent cause of action. (Def.'s Mot. 12–14.) The Court agrees.

The law in this district is clear that a failure to pay, or a withholding, of wages does not constitute a "deduction" within the meaning of § 193. As the court explained in *Gold v. American Medical Alert Corp.*, No. 14 Civ. 5485 JFK, 2015 WL 4887525, at *2 (S.D.N.Y. Aug. 17, 2015), "total withholding of wages . . . is the essence of a breach of contract claim," while "Section 193 requires something more: a specific instance of docking the employee's pay." A "'deduction' is more targeted and direct than [a] wholesale withholding" and is "better understood as, and limited to, things like fines, payments, or other forms of pay docking." *Id.* at *5; *see also Malinowski v. Wall St. Source, Inc.*, No. 09 Civ. 9592 (PAE), 2012 WL 279450, at *3 n.5 (S.D.N.Y. Jan. 31, 2012) (internal quotation marks and alteration omitted) ("The majority, and more persuasive,

interpretation of § 193 is that it has nothing to do with failure to pay wages or severance benefits, governing instead the specific subject of making deductions from wages." (quoting *Monagle v. Scholastic, Inc.*, No. 06 Civ. 14342 (GEL), 2007 WL 766282, at *2 (S.D.N.Y. Mar. 9, 2007))). Because Dreni alleges nothing more than a withholding of a portion of his pay (*i.e.*, commissions), his claim under § 193 fails. *See Komlossy v. Faruqi & Faruqi, LLP*, 15 Civ. 9316 (KPF), 2017 WL 722033, at *14 (S.D.N.Y.) (finding that defendants' nonpayment of a fee commission "constitutes a failure to pay the wage, not a 'deduction' of the wage in violation of § 193"), *aff'd*, 714 F. App'x 11 (2d Cir. 2017); *Gold*, 2015 WL 4887525, at *2–3 (collecting cases); *see also Goldberg v. Jacquet*, 667 F. App'x 313, 314 (2d Cir. 2016) (summary order) ("The district court correctly ruled that although Goldberg did not receive wages to which he was entitled, his wages were not reduced in the manner prohibited by NYLL § 193.").

Dreni argues that his cause of action should survive under *Ryan v. Kellogg Partners Institutional Services*, 19 N.Y.3d 1, 945 N.Y.S.2d 593, 968 N.E.2d 947 (2012). (Pl.'s Opp. 21–22.) In *Ryan*, the New York Court of Appeals held that an employer's neglect to pay an employee a bonus that "had been earned and was vested before [the employee] left his job" violated Section 193. 19 N.Y.3d at 16. Notwithstanding this decision, courts in this circuit continue to hold that a failure to pay wages does not constitute a "deduction" under Section 193. *See, e.g.*, *Komlossy*, 2017 WL 722033, at *14; *Gold*, 2015 WL 4887525, at *2–3; *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 36 (W.D.N.Y. 2014); *see also Goldberg*, 667 F. App'x at 314. Indeed, the courts in *Komlossy*, 2017 WL 722033, at *13–14, and *Gold*, 2015 WL 4887525, at *2–3, considered and rejected the same argument Dreni makes here. In *Gold*, the court recognized that in *Ryan*—and, more generally, the line of cases on which Dreni relies—"there [wa]s no indication . . . that the parties disputed whether the withholding was specific enough to be considered a 'deduction'" and

"those cases explicitly frame their analysis as interpreting the definition of 'wages,' not deduction."   2015 WL 4887525, at *3 (collecting cases).   As *Gold* recognized, no case law "interpret[s] these cases as resolving the issue of what counts as a 'deduction' in favor of [Dreni's] construction."   *Id.* at *4.   Therefore, the Court joins the other courts in this circuit that have concluded that a plaintiff must show something more targeted and direct than a simple withholding of wages to establish a deduction under § 193, *id.* at *5, and holds that PrinterOn is entitled to judgment as a matter of law on Dreni's § 193 claim.

It follows that Dreni is also not entitled to relief under § 198.   Section 198 is a remedies provision, and these remedies "are available *only when* a claimant has established a violation of his rights under a substantive portion of [NYLL] Article 6."   *Malinowski*, 2012 WL 279450, at *2 (citing *Gottlieb v. Kenneth D. Laub & Co.*, 82 N.Y.2d 457, 462, 605 N.Y.S.2d 213, 626 N.E.2d 29 (1993)); *see also id.* (noting that § 193 "does not supply a freestanding right to relief" (citing *Fin. Techs. Int'l, Inc. v. Smith*, 247 F. Supp. 2d 397, 413 (S.D.N.Y. 2002))); *Monagle*, 2007 WL 766282, at *2 (recognizing that § 198 "provides no substantive cause of action at all").   Because Dreni's claim under § 193 fails, his claim under § 198 also fails.   Accordingly, PrinterOn's motion for summary judgment on Dreni's NYLL claims is granted.

### 4. Dreni's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, PrinterOn moves for summary judgment on Dreni's claim for breach of the implied covenant of good faith and fair dealing.   New York law implies a covenant of good faith and fair dealing in all contracts.   *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc*., 769 F.3d 807, 817 (2d Cir. 2014) (citations omitted).   This covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."   *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007)

(quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995)). A claim for breach of this covenant "may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 Civ. 9116(PGG), 2009 WL 321222, at *4 (S.D.N.Y. Feb. 9, 2009) (quoting *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 180–81 (S.D.N.Y. 2007)). Thus, a claim for breach of the covenant "will be dismissed as redundant where the conduct allegedly violating the implied covenant is a predicate also for a claim for breach of an express provision of the contract." *Baguer v. Spanish Broad. Sys., Inc.*, No. 04 CIV. 8393 (RJS), 2010 WL 2813632, at *17 (S.D.N.Y. July 12, 2010) (quoting *Kamfar v. New World Rest. Group, Inc.,* 347 F. Supp. 2d 38, 52 (S.D.N.Y. 2004)) (dismissing a good faith and fair dealing claim regarding commission payments that was duplicative of the breach of contract claim), *aff'd*, 423 F. App'x 102 (2d Cir. 2011).

PrinterOn argues that Dreni's good faith and fair dealing claim is duplicative of his breach of contract claim and should therefore be dismissed. (Def.'s Mot. 21.) Dreni counters that the predicate facts underlying his good faith and fair dealing claim are distinct from his breach of contract claim and fall into two buckets: (1) PrinterOn shifted Dreni's accounts to other employees to deny Dreni commissions; and (2) PrinterOn delayed invoicing certain accounts until after Dreni had been terminated to avoid paying him commissions. (Pl.'s Opp. 17–19.)

The Court finds that Dreni's good faith and fair dealing claim is not wholly duplicative of his breach of contract claim and can legally support an independent cause of action. PrinterOn oversimplifies the allegations when it argues that Dreni's good faith and fair dealing claim is nothing more than a claim that Dreni "did not receive the proper amount of commission

compensation, despite having performed all work contractually required of him to earn the same."

(Def.'s Mot. 21.)  Dreni alleges more: that "PrinterOn took steps so that certain commission

revenue would never become payable to Mr. Dreni" (Compl. ¶ 34); that "PrinterOn unilaterally

reassigned revenue that would otherwise result in earned compensation being paid to Mr. Dreni

and transferred accounts assigned to Mr. Dreni under the applicable Commission Plan to other

employees" (*id.* ¶ 35); and that "PrinterOn terminated Mr. Dreni to avoid payment of

compensation that was already earned by Mr. Dreni and/or that was coming due to Mr. Dreni"

(*id.* ¶ 54).  Thus, in theory, even if a jury finds that PrinterOn did not breach the contracts, Dreni

could very well recover on his good faith and fair dealing claim.[15]  For example, by reassigning

revenue on which Dreni would have earned commission or transferring accounts to other

employees to avoid paying Dreni commission, PrinterOn may not have "breach[ed] the terms of

the contract in a technical sense" but would have "nonetheless deprived [Dreni] of the benefit of

[the] bargain."  *Pearce*, 528 F. Supp. 2d at 180–81.  Dreni's good faith and fair dealing claim is

therefore distinct from and not duplicative of his breach of contract claim.  *See H&H Envtl. Sys.,*

*Inc. v Evanston Ins. Co.*, 6:18-CV-06315 EAW, 2019 WL 1129434, at *7 (W.D.N.Y. Mar. 12,

2019) (finding good faith and fair dealing claim not duplicative where "Plaintiff claim[ed] that

Defendants' delay in paying Plaintiff's alleged losses has created additional losses which would

not otherwise be remedied by a full payment of Plaintiff's breach of contract claim" (citing *Bi-*

*Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 195, 856 N.Y.S.2d 505, 886

N.E.2d 127 (2008))); *Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 195

---

[15] Indeed, a central issue here is also implicated in PrinterOn's motion for summary judgment on Dreni's breach of contract claim—that is, what commissions were owed upon Dreni's termination. As a contractual issue, the parties dispute what action—invoicing or receiving revenue—triggers entitlement to commissions. But that issue is insignificant for purposes of Dreni's good faith and fair dealing claim because part of Dreni's theory is that regardless of what event triggers Dreni's entitlement to commissions, PrinterOn intentionally delayed that event until after Dreni had been terminated.

(E.D.N.Y 2014) (finding good faith and fair dealing claim not duplicative where "the facts supporting each claim [we]re not identical"); *Gruppo, Levey & Co. v. ICOM Info. & Commc'ns, Inc.*, No. 01 Civ.8922 JFK, 2003 WL 21511943, at *9 (E.D.N.Y. July 1, 2003) (finding good faith and fair dealing claim "premised on the notion that [defendant] misled [plaintiff] with regard to its intent to pay a Transaction Fee . . . not duplicative of [plaintiff's] claim for breach of the duty to pay a Transaction Fee").

PrinterOn argues that even if Dreni's good faith and fair dealing claim is not duplicative of his breach of contract claim, Dreni has failed to adduce any evidence of bad faith as required to sustain the claim.  (Def.'s Mot. 21.)   PrinterOn asserts that Dreni's "bald contentions" and "unsupported assertions" are insufficient as a matter of law to create a triable question of fact. (Def.'s Reply 9 [ECF No. 69].)[16]

PrinterOn relies on well-settled principles.  It is true that "[t]he party opposing the motion for summary judgment must set forth concrete particulars," *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotation marks, alteration, and citations omitted), as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (ellipsis and citation omitted).   Furthermore, "self-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and to defeat a motion for summary judgment."  *Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 482 (S.D.N.Y. 2013) (citing *BellSouth Telecomms.*, 77 F.3d at 615).

---

[16] Citations to "Def.'s Reply" are references to PrinterOn's Reply brief in support of its motion for summary judgment [ECF No. 69].

But PrinterOn ignores governing law with respect to the implied covenant of good faith and fair dealing.  To state a claim for breach of the implied covenant of good faith and fair dealing, "the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Dweck Law Firm, L.L.P. v. Mann*, 340 F. Supp. 2d 353, 358 (S.D.N.Y. 2004) (quoting *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 514, 697 N.Y.S.2d 128 (2d Dep't 1999)). "Where the contract contemplates the exercise of discretion, [the covenant] includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *Dalton*, 87 N.Y.2d at 389).  While courts generally find "that a defendant violates the covenant of good faith and fair dealing only when he acts with some improper motive," *Wagner v. JP Morgan Chase Bank*, No. 06-cv-3126 (RJS), 2011 WL 856262, at *4 (S.D.N.Y. Mar. 9, 2011) (internal quotation marks and citation omitted), a plaintiff need not present direct evidence of an improper motive.  Rather, bad faith can be inferred from evidence that the defendant's conduct was arbitrary or contrary to reasonable expectations.  *See Fishoff*, 634 F.3d at 653.

The "covenant is violated when a party promises commissions or profits and then does not act in good faith to permit such commissions or profits to be earned, thereby depriving the other party of the benefit of the bargain." *Wagner*, 2011 WL 856262, at *3 (quoting *Keene Corp. v. Bogan*, No. 88 CIV. 0217 (MBM), 1990 WL 1864, at *14 (S.D.N.Y. Jan. 11, 1990)).  A plaintiff may recover under the covenant of good faith and fair dealing by demonstrating that his employer fired him to avoid paying commissions otherwise owed.  *Wakefield v. N. Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985).  "Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is

ordinarily a question of fact to be determined by the jury or other finder of fact." *Tractebel Energy Mktg., Inc.*, 487 F.3d at 98 (quoting 23 Williston on Contracts § 63:22 (4th ed.)).

Here, there is a question of fact as to whether PrinterOn's conduct breached the implied covenant of good faith and fair dealing. The allegations of the complaint that PrinterOn failed to compensate Dreni for work on particular accounts (which PrinterOn contends is a matter of the timing of invoices, a variable that was within PrinterOn's control), reassigned revenue that would otherwise result in earned compensation being paid to Dreni, and transferred accounts assigned to Dreni to other employees (Compl. ¶ 34–35, 56), permit a reasonable inference that PrinterOn's actions were calculated to deprive Dreni of commissions to which he otherwise would have been entitled under the Employment Agreement and the 2013 Commission Plan. Furthermore, evidence in the record suggests PrinterOn may have intentionally delayed invoicing, thereby depriving Dreni of the fruits of the contracts. (*See* Dreni Decl. Opp. ¶¶ 36–39.) One month before Dreni was fired, PrinterOn executives circulated a "Management Plan" for 2018 that listed under Dreni's name accounts PrinterOn expected to generate income based on contracts Dreni had already secured, including Samsung, Nuance, ACDI, and Envisionsware. (*Id.* ¶ 37; *see* Dreni Decl. Opp. Ex. L [ECF No. 64-12].) Dreni contends that under some of those sales contracts, PrinterOn could have sent out invoices prior to Dreni's termination but did not do so. (Dreni Decl. Opp. ¶ 38.)

The Second Circuit has recognized that "obligations derived from the covenant of good faith implicit in [a] commission contract may survive the termination of the employment relationship." *Wakefield*, 769 F.2d at 112. In *Wakefiled*, the plaintiff claimed his employer fired him "after he had performed services that assured a number of sales in the future." *Id.* at 111. The court allowed a good faith and fair dealing claim, finding that the employer could not fire the employee "for the purpose of avoiding the payment of commissions which are otherwise owed."

*Id.* at 112. Here, similarly, the complaint alleges that "PrinterOn timed Mr. Dreni's termination such that it would retain the benefits of Mr. Dreni's previous work and keep the revenue from [his] accounts, including the compensation that Mr. Dreni had earned and that was coming due to him, but that he was not paid." (Compl. ¶ 40; *see also* Dreni Decl. Opp. ¶ 36–39.) Reassigning his accounts, delaying invoices, or firing him to avoid payment of commissions would deprive Dreni of the benefits of the Employment Agreement and the 2013 Commission Plan, in breach of the implied covenant of good faith and fair dealing. *See Pearce*, 528 F. Supp. 2d at 180–81.

The Court therefore finds that a strong enough inference can be drawn from the record to support a conclusion that PrinterOn's actions were arbitrary, unreasonable, and inconsistent with the duty of good faith and fair dealing. *See Fishoff*, 634 F.3d at 653 ("Indeed, it is difficult to conceive of a set of facts under which [defendant's] seemingly arbitrary post hoc valuation, which was applied *only* to Fishoff and only *after* he exercised his options, would not be a clear violation of the duty of good faith and fair dealing; [defendant's] actions plainly denied [plaintiff] the fruits of the contract."). Accordingly, there are triable issues of fact that preclude entry of summary judgment for PrinterOn on this claim. *See Tractebel Energy Mktg., Inc.*, 487 F.3d at 98 (quoting Williston § 63:22); *see also Enzo Biochem, Inc. v. PerkinElmer, Inc.*, 2013 WL 5943987, *3 (S.D.N.Y. Oct. 28, 2013) (finding question of fact where plaintiff "produced evidence that supports the existence of a scheme to deprive [plaintiff] of full-kit royalties in contravention of the Distribution Agreement").

## B. Dreni's Motion for Partial Summary Judgment

### 1. Dreni's Breach of Contract Claim with Respect to Maintenance Commissions

Dreni seeks summary judgment on the portion of his breach of contract claim seeking payment for "maintenance commissions." He argues that under the Employment Agreement and

2013 Commission Plan, he is entitled to commissions on maintenance-related revenue for which he was not paid.  (Pl.'s Mot. 3–5.)  PrinterOn counters that Dreni ignores the distinction between *new* maintenance contracts (for which he was paid) and *renewals* of existing maintenance contracts (for which he was not paid) and that Dreni is entitled only to the former under the contracts.  (Def.'s Opp. 5–10 [ECF No. 73].)[17]

Two contractual provisions are at issue here.  First, the "Commission" section of the Employment Agreement provides, "In addition [to salary], the Employee will receive commission based upon *sales revenue* procured in the Employee's assigned market space as detailed in [the 2013 Commission Plan]."  (Jt. 56.1 Ex. 1 (emphasis added).)  The "Annual Personal Quota" section of the 2013 Commission Plan then states, "$1,000,000 *net new revenue* in your Target Market. . . .  *All* hardware, software, training and *services revenue* will count toward my annual quota."  (*Id.* (emphasis added).)

Dreni argues that "sales revenue" in the Employment Agreement includes maintenance-related revenue (which PrinterOn does not dispute (*see* Def.'s Opp. 8)) and that maintenance renewals are not excluded from the Employment Agreement.  (Pl.'s Mot. 4–5.)  He points to the phrase "[a]ll . . . services revenue" in the 2013 Commission Plan as evidence that the parties intended to include revenue from both new maintenance agreements and renewal of maintenance services in his commissions.  (*Id.* at 4.)  He also points out that subsequent commission plans contained a stand-alone section titled, "Specific Exclusions," in which PrinterOn declined to list maintenance revenue.  (Pl.'s Reply 7–8 [ECF No. 78].)[18]

---

[17] Citations to "Def.'s Opp." are references to PrinterOn's memorandum of law in opposition to Dreni's motion for partial summary judgment [ECF No. 73.

[18] Citations to "Pl.'s Reply" are references to Dreni's Reply brief in support of his motion for partial summary judgment [ECF No. 78].

PrinterOn argues that the "net new revenue" phrase in the 2013 Commission Plan limits Dreni's commissions to newly generated business. (Def.'s Opp. 6–7.) PrinterOn also argues that while this could include new maintenance contracts, it would not include a renewal of a maintenance contract by an existing client. (*Id.* at 6.) In addition, PrinterOn cites deposition testimony explaining how efforts to encourage existing clients to renew maintenance contracts were generally led by finance and administrative employees, not salespeople like Dreni. (*Id.* at 8–9.)

The Court finds the contractual language to be ambiguous as to whether Dreni is entitled to commissions on maintenance renewals of preexisting clients. On one hand, as Dreni argues, the use of "sales revenue" in the Employment Agreement and "[a]ll . . . services revenue" in the 2013 Commission Plan is arguably broad enough to include maintenance renewals. But Dreni's argument regarding the "Specific Exclusions" sections in subsequent sales contracts is unconvincing, if not irrelevant, because these sections mention the sale and licensing of patents and the sale of corporate assets or capital stock—lines of business different from that in which Dreni worked. And a failure to exclude where there are words of limitation in text does not equal inclusion or override the specific limitation. On the other hand, the 2013 Commission Plan states, "$1,000,000 net *new* revenue," which suggests renewal of preexisting maintenance contracts would not be included.

Extrinsic evidence, moreover, does not resolve the ambiguity. PrinterOn offers evidence to the effect that renewals were not intended or expected to be part of commissions. For example, PrinterOn executives Noreikis and Ritchie testified that they understood the 2013 Commission Plan to not include commissions on maintenance renewals. (Salmon-Smith Decl. Opp. Ex. A

180:6–181:22 [ECF No. 74-1] (Noreikis);[19] Salmon-Smith Decl. Opp. Ex. B. 162:20–163:11 [ECF No. 74-2] (Ritchie).)   Yet Dreni claims that he had been paid commissions on maintenance renewals of preexisting accounts—specifically, the Samsung SCP account.  (Pl.'s Reply Aff. ¶ 7 [ECF No. 80].)  This claim finds support in the record.  In a 2016 e-mail to Cunningham and Noreikis regarding maintenance income for the Samsung SCP account, which Dreni first signed up in 2014, Ritchie stated, "I am assuming Denis gets the commission on this – he did last year." (Cassubhai Reply Aff. Ex. P 59:19–24 [ECF No. 82-16].)  Ritchie also testified that if a salesperson "was heavily involved in the renewal process, he may have been compensated."  (Salmon-Smith Decl. Opp. Ex. B 165:4–5].)  This extrinsic evidence makes clear that while there was no well-established, uniform custom of paying commissions on maintenance renewals, *see Law Debenture Trust Co.*, 595 F.3d at 466, the parties did not understand the Employment Agreement and commission plans to exclude outright commissions on maintenance renewals.

Given the ambiguity of the contractual language and the conflicting extrinsic evidence of the parties' intent and understanding of that language, the Court finds that there are genuine disputes of fact with respect to whether Dreni is entitled to commissions on maintenance renewals for preexisting clients.  *See Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (explaining that where contractual language is susceptible to differing reasonable interpretations and "where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact" (citations omitted)).  Accordingly, Dreni's motion for summary judgment on the maintenance renewal portion of his breach of contract claim is denied.

---

[19] Citations to "Salmon-Smith Decl. Opp." are references to the declaration of Tracey Salmon-Smith in opposition to Dreni's motion for partial summary judgment [ECF No. 74].

### 2.  PrinterOn's Counterclaim Under CFAA § 1030

Dreni also moves for summary judgment on PrinterOn's counterclaim under Section 1030 of the Computer Fraud and Abuse Act concerning retention of the PrinterOn laptops after his termination.  To sustain a civil claim for violation of the CFAA, PrinterOn must establish that Dreni (1) obtained information through intentional unauthorized access to a computer and (2) caused damage or loss as a result.  18 U.S.C. § 1030(a)(2)(C), (a)(5)(C).  Any civil action under the CFAA involving "damage or loss" must satisfy a $5,000 threshold.  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 439 (2d Cir. 2004) (collecting cases).  "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information," *id.* § 1030(e)(8), and "loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service," *id.* § 1030(e)(11).

Courts have recognized that "the costs of investigating security breaches constitute recoverable 'losses,' even if it turns out that no actual data damage or interruption of service resulted from the breach."  *Univ. Sports. Pub. Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 387 (S.D.N.Y. 2010) (citations omitted); *see also In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) (recognizing that "any economic losses" a party bears "in securing or remedying their systems in the wake of [an] alleged CFAA violation[] would count towards § 1030(e)(8)(A)'s damage threshold").  But damages awarded by courts under the CFAA "have generally been limited to those costs necessary to assess the damage caused to the [party's] computer system or to rescue the system in the wake of a spamming attack."  *Tyco Intern. (US) Inc. v. John Does, 1–3*, No. 01 Civ.3856(RCC)(DF), 2003 WL 23375767, at *3 (S.D.N.Y. Aug.

29, 2003) (citations omitted).  Thus, costs beyond those necessary to assess and remedy damage are generally excluded from the $5,000 loss calculation threshold.  *See In re DoubleClick*, 154 F. Supp. 2d at 525–26.

PrinterOn alleges in its moving papers that its "loss" is the forensic indexing expenses it incurred from the vendor examining the laptops to determine what proprietary PrinterOn material Dreni might have accessed after his termination.  (Def.'s Opp. 11–12; *see* Def.'s Resp. Pl.'s 56.1 ¶¶ 24–32.)  These forensic indexing expenses total $5,381.52 and are composed of $3,131.52 in "professional services" (Salmon-Smith Decl. Opp. Ex. L) and $2,250 in "storage" costs (Salmon-Smith Decl. Opp. Ex. M).  Dreni argues that certain fees should be excluded from the loss calculation.  His arguments are as follows: (1) the forensic indexing costs do not qualify as losses under the CFAA; (2) even if they do qualify, the $3,131.52 of "professional services" should be excluded for failure to specify the amount incurred for forensic indexing, as opposed to expenses PrinterOn would have incurred regardless of Dreni's retention of the laptops; (3) even if the entire professional services fee qualifies as a loss, the storage fees do not; and (4) even if the storage fees qualify, the two months of storage fees that post-date completion of the forensic indexing should be excluded.  (Pl.'s Mot. 5–7; Pl.'s Reply 2–6.)  The Court agrees in part with Dreni and finds that PrinterOn has failed to satisfy the $5,000 loss threshold.

Assuming the "professional services" fee qualifies as a loss, which it likely does, Dreni raises a legitimate issue arising from PrinterOn's failure to specify what portion of these fees relates to forensic indexing resulting from Dreni's retention of the laptops.  Failure to specify what portions of expenses are tied to the alleged loss can be fatal to a CFAA claim.  *See Reis, Inc. v. Lennar Corp.*, 15 Civ. 7905 (GBD), 2016 WL 3702736, at *7 (S.D.N.Y. July 5, 2016) (finding plaintiffs failed to satisfy $5,000 threshold because they "d[id] not specify which portion of any

investigatory expenses resulted from Defendants' conduct" (citing *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015))).  PrinterOn claims that the entire "professional services" bill was for indexing.  (Def.'s Opp. 11–12.)  Dreni on the other hand offers no evidence that PrinterOn would have had to conduct forensic indexing had he not retained the laptops.  Drawing inferences in favor of PrinterOn as the nonmovant, the Court finds that the entire "professional services" fee relates to assessing potential security breaches or damages stemming from Dreni's conduct and therefore qualifies as a loss under the CFAA.

Critically, however, with respect to the "storage fees," PrinterOn claimed at oral argument that it needed to pay to continue to store the laptops with the third-party vendor upon completing the forensic indexing to ensure a clean "chain of custody" necessary for purposes of the merits of its CFAA claim.  (Tr. 67:12–20.)  Specifically, counsel for PrinterOn stated, "it's part of a chain of custody because now — it's a chain of custody thing.  I think that it remains better that a third party is holding it and is storing all the information, rather than me returning it to my client.  So it maintains a chain of custody."  (Tr. 67:12–16.)  In fact, PrinterOn admitted that the laptops remained in the possession of the vendor through to oral argument and argued that these continuing storage costs, accruing at a rate of $250 per month, would also qualify as "losses" under the CFAA. (Tr. 65:25–67:7.)

PrinterOn's "chain of custody" justification makes clear that, at the very least, the storage costs that post-date the forensic indexing are best characterized as litigation expenses, which are too far removed from the forensic assessment to constitute "losses" under the CFAA.  *See Tyco Intern. (US) Inc.*, 2003 WL 23375767, at *3; *cf. Nexans v. Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 476–77 (S.D.N.Y. 2004) (holding that travel costs incurred by plaintiff's executives to investigate misappropriation of stored data did not qualify as losses under CFAA because they

were unrelated to "any type of computer investigation or repair" or preventative security measures), *aff'd*, 166 F. App'x 559 (2d Cir. 2006).[20]   Indeed, several courts across the country have concluded that litigation-related expenses do not qualify as "losses" under the CFAA.  *See, e.g.*, *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) ("[L]itigation costs are not a compensable loss under the CFAA because they are not related to investigating or remedying damages to the computer." (citations omitted)); *First Mortg. Corp. v. Baser*, No. 07 C 6735, 2008 WL 4534124, at *3 (N.D. Ill. ADef.'s 30, 2008) (finding that "costs unrelated to the computer itself, such as litigation expenses . . . do not qualify" (citation omitted)); *Wilson v. Moreau*, 440 F. Supp. 2d 81, 110 (D.R.I. 2006) (holding that "as a matter of law, the costs of litigation cannot be counted towards the $5,000 statutory threshold").  Subtracting $500 in storage fees for December 2019 and January 2020, the two months included in the invoice that post-date the forensic indexing—as well as any ongoing storage fees for which PrinterOn may try to seek losses (*see* Tr. 67:3–7)—puts the claimed loss amount at $4,881.51, below the statutory threshold of $5,000.[21] Accordingly, PrinterOn has failed to state a claim under the CFAA.  The Court therefore grants summary judgment on PrinterOn's CFAA counterclaim in favor of Dreni.

---

[20] Dreni admits that he retained the laptops despite a contractual obligation to return them. (Jt. 56.1 ¶ 22.) He claims he would have returned the laptops sooner but wanted assurances that PrinterOn would not access his personal information. (Pl.'s Reply 2 n.2.) As a result, the forensic examination and the entering of the indexing and storage invoices into the record occurred after discovery had closed. Dreni protests that these filings were untimely and that he never had an opportunity to examine or contest these fees during discovery. (Pl.'s Reply 2.) The Court need not address this discovery concern because PrinterOn has not satisfied the $5,000 loss threshold.

[21] The Court assumes without deciding that the fees PrinterOn incurred for the seven months of storage before and during the forensic indexing qualify as losses under the CFAA. Those fees might be recoverable as "losses" since, as PrinterOn argues, they were caused by Dreni's unauthorized retention of the laptops. (Def.'s Opp. 11–12; *see also* Pl.'s Reply 2 n.2.) Nevertheless, the Court need not reach that issue because, as discussed above, merely deducting storage fees that post-date the forensic indexing puts PrinterOn's claimed losses below the $5,000 threshold, and as such, PrinterOn fails to state a claim.

## V.    CONCLUSION

For the foregoing reasons, PrinterOn's motion for summary judgment is DENIED with respect to the defense that Dreni released all claims; DENIED with respect to its breach of contract counterclaim relating to the severance payment; DENIED with respect to its statute of limitations defense to Dreni's breach of contract claim insofar as it relates to the Docomo account; GRANTED with respect to Dreni's claims for commissions in connection with the Docomo account; GRANTED with respect to Dreni's claims under NYLL; and DENIED with respect to Dreni's claim for breach of the implied covenant of good faith and fair dealing.  Accordingly, Count Two (NYLL claim) of the complaint is dismissed.

Dreni's motion for partial summary judgment is DENIED with respect to the portion of his breach of contract claim concerning maintenance renewal commissions and GRANTED with respect to PrinterOn's counterclaim under the CFAA.    Accordingly, PrinterOn's First Counterclaim is dismissed.

The parties shall appear for a final pretrial conference on October 8, 2020, at 11:30 AM. The parties should consult the Court's Individual Practice Rules and ensure compliance therewith.


**SO ORDERED.**

_Mary Kay Vyskocil_

**Date:  September 14, 2020**             **MARY KAY VYSKOCIL**
   **New York, NY**                  **United States District Judge**