UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___9/3/2021___

DENIS DRENI,

Plaintiff,

-against-

PRINTERON AMERICA CORPORATION,

Defendant.

1:18-cv-12017-MKV

OPINION AND ORDER
DENYING MOTION FOR
RECONSIDERATION

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Denis Dreni has moved for partial reconsideration of the Court's Opinion and Order granting in part and denying in part the parties' cross-motions for summary judgment. (Opinion & Order [ECF No. 88].)  *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712 (S.D.N.Y. 2020).  In a stridently framed motion that is far more expansive than the briefing on the original motion, Dreni takes issue with the Court's granting summary judgment in favor of Defendant PrinterOn America Corporation on Dreni's claim that, under his Employment Agreement and the 2013 Commission Plan, he is entitled to commissions in connection with the $1 million payment relating to the reseller and distributor agreement between Docomo interTouch Pte. Ltd. ("Docomo") and PrinterOn (the "Docomo Pre-Payment").  (Pl.'s Recons. Mem. [ECF No. 90].)

The Court has carefully reviewed its Opinion and Order, the parties' briefs on the motion for reconsideration, the underlying record, and relevant caselaw.  For the reasons discussed below, Dreni's motion for reconsideration is DENIED.

## LEGAL STANDARDS

### A. Motion for Reconsideration

Reconsideration of an opinion of the Court is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Buffalo Laborers Sec. Fund v. J.P Jeanneret Assocs., Inc.* (*In re Beacon Assocs. Litig.*), 818 F. Supp. 2d 697, 701 (S.D.N.Y. 2011) (quoting *In re Health Mgmt. Sys. Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)). The standard must be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." *Girl Scouts of the U.S.A. v. Boy Scouts of Am.*, No. 18 Civ. 10287 (AKH), 2020 WL 6323130, at *1 (S.D.N.Y. Oct. 28, 2020) (quoting *Dellefave v. Access Temporaries, Inc.*, No. 99 CIV. 6098 (RWS), 2001 WL 286771, at *1 (S.D.N.Y. Mar. 22, 2001)).

To succeed on a motion for reconsideration, the movant must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 54 (2d Cir. 2019) (quoting *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). "A motion for reconsideration should be granted only when the [movant] identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d

Cir. 1998)).  "The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court." *Cooper v. Lapra*, No. 18 Civ. 9405 (KPF), 2020 WL 7027592, at *1 (S.D.N.Y. Nov. 30, 2020) (quoting *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383, 403 n.6 (S.D.N.Y. 2011)).

**B.  Summary Judgment**

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment "serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El. v. Britton*, 523 U.S. 574, 600 (1998); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 49 (2d Cir. 2000).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 133 (2d Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  There is "no magical talisman or compass that will serve as an unerring guide to determine when a material issue of fact is presented.  As is so often true in the law, this is a matter of informed and properly reasoned judgment." *Padilla v. Maersk Line, Ltd.*, 603 F. Supp. 2d 616, 622 (S.D.N.Y. 2009) (quoting *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.–Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967)).

### C.  Contract Interpretation at the Summary Judgment Stage

Under New York law, "the initial question for the court on a motion for summary judgment with respect to a contract claim is 'whether the contract is unambiguous with respect to the question disputed by the parties.'"  *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  Whether a contract is clear or ambiguous is a question of law for the court to decide.  *Id.* at 465–66 (collecting cases).  Contract language is ambiguous if the terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* at 466 (quoting *Int'l Multifoods*, 309 F.3d at 83).  "Contract language is unambiguous when it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (alteration in original) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

When contract language is ambiguous, "the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is 'so one-sided that no reasonable person could decide to the contrary.'" *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 559 F.3d 102, 115 (2d Cir. 2010) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)).  "Similarly, summary judgment may be granted despite any ambiguities in the contract 'where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case.'" *Id.* (alteration in original) (quoting *Topps Co., Inc. v.*

*Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)).   "These apparent exceptions merely reinforce the principle that the lynchpin of a summary judgment determination is, in most cases, the existence *vel non* of genuine issues of material facts."   *Id.* (citing *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999)); *accord Mindspirit, LLC v. Evalueserve, Ltd.*, 346 F. Supp. 3d 552, 574–75 (S.D.N.Y. 2018).

## DISCUSSION

In its Opinion and Order, the Court found the plain terms of the Employment Agreement and the 2013 Commission Plan to be ambiguous with respect to whether Dreni is entitled to commissions on the Docomo Pre-Payment—that is, both parties presented reasonable interpretations of the contract language on this issue.   (Opinion & Order 16.)   Specifically, considering the context and circumstances surrounding the Employment Agreement and the 2013 Commission Plan, the Court found reasonable PrinterOn's interpretation that the sub-language under Docomo—"Expand relationship to Nomadix and NTT Docomo (parent)"—limits Dreni's connection to Docomo to expansion of PrinterOn's pre-existing relationship, thereby excluding commissions on the Docomo Pre-Payment.   (*Id.* at 16–17.)   Having found that the contract language was ambiguous, the Court turned to extrinsic evidence and concluded that the relevant extrinsic evidence made clear that the parties did not intend for Dreni to receive commissions on the Docomo Pre-Payment.   (*Id.* at 17–19.)   Dreni offered no competent evidence in support of his interpretation to rebut PrinterOn's evidence, so as to create a genuine issue of material fact.   (*Id.*)

Dreni argues in his reconsideration motion that the Court overlooked, did not consider, or failed to address particular matters or arguments.   (*See generally* Pl.'s Recons. Mem.)   Dreni is incorrect; the Court carefully considered all of Dreni's arguments.   The Court did not directly address all of his arguments because they do not hold water.   "The Court need not detail all of its

reasons for granting summary judgment, and any arguments [Dreni] made that were not expressly rejected in the [Opinion and] Order were rejected implicitly." *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07 Civ. 11316(HB), 2009 WL 1605783, at *3 (S.D.N.Y. June 9, 2009), *aff'd*, 372 F. App'x 137 (2d Cir. 2010); *see also Miller v. Metro. Life Ins. Co.*, No. 17 Civ. 7284 (AT) (SN), 2018 WL 5993477, at *5 n.5 (S.D.N.Y. Nov. 15, 2018) (noting that "there is no requirement for a court to specifically address each and every argument raised by a party" (quoting *Driessen v. Royal Bank Int'l*, No. 14 Civ. 1300, 2015 WL 881205, at *2 (D. Conn. Mar. 2, 2015)).

Dreni's reconsideration motion is an abusive litigation initiative: Dreni devotes forty-four pages to the Docomo Pre-Payment issue is his reconsideration briefs (Pl.'s Recons. Mem. [ECF No. 90]; Pl.'s Recons. Reply [ECF No. 94]), after having devoted only seven pages to it in his summary judgment briefs (Pl.'s Opp. Summ. J. 7–12 [ECF No. 54]; Pl.'s Reply Summ. J. 10 [ECF No. 78]).  Given Dreni's polemical tone and full-blown assault on the Court's earlier treatment of the Docomo issue in his reconsideration motion, the Court addresses his arguments in detail below. Dreni's arguments fall into four categories: (1) the Court erred in considering the context and the circumstances surrounding the execution of the Employment Agreement (Pl.'s Recons. Mem. 16–17); (2) "PrinterOn's textual argument concerning Nomadix and NTT Docomo is not credible and plainly unreasonable" (*id.* at 12); (3) the Court failed to distinguish between Dreni's "Annual Personal Quota" and the "Annual Company Target" (*id.* at 17); and (4) the Court "overlooked significant extrinsic evidence *pre-dating* the contract" and "ignored significant *post-contract* evidence," which "the Court may have misguidedly dismissed as legally irrelevant" (*id.* at 21–22).

A.  **The Court Properly Considered the Context and Circumstances
Surrounding the Execution of the Employment Agreement
in Determining Whether the 2013 Commission Plan Is Ambiguous**

The Court's consideration of the context and circumstances surrounding the execution of

the Employment Agreement is consistent with well-established precedent.  In determining whether

a contract is ambiguous "a court need not turn a blind eye to context."  *Dev. Specialists, Inc. v.

Peabody Energy Corp.* (*In re Coudert Bros.*), 487 B.R. 375, 389 (S.D.N.Y. 2013).  As the New

York Court of Appeals has explained:

> in deciding whether an agreement is ambiguous courts should examine the
> entire contract and consider the relation of the parties and the circumstances
> under which it was executed.  Particular words should be considered, not as
> if isolated from the context, but in the light of the obligation as a whole and
> the intention of the parties as manifested thereby.  Form should not prevail
> over substance and a sensible meaning of words should be sought.

*Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) (internal quotation

marks omitted) (quoting *Atwater & Co. v. Pan. R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927)).

The Second Circuit has long followed this approach.  *See Subaru Distribs. Corp. v. Subaru of Am.,

Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) ("A court in determining the parties' intention should

consider the circumstances surrounding the transaction as well as the actual language of the

contract."); *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) (second alteration in original)

(noting that "a court should accord th[e] language its plain meaning giving due consideration to

'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish'"

(quoting *Atwater*, 246 N.Y. at 534)); *United States v. Lennox Metal Mfg. Co.*, 225 F.2d 302, 311

(2d Cir. 1955) ("[I]t is regarded by many authorities as a fallacy that, in interpreting contractual

language, a court may not consider the surrounding circumstances unless the language is patently

ambiguous.  Any such rule, like all rules of interpretation, must be taken as a guide, not a dictator.

The text should always be read in its context.  Indeed, text and context necessarily merge to some

extent . . . ."). Put simply, "a court may consider the factual circumstances surrounding the execution of a contract, because the court's primary purpose in interpreting the agreement is to determine the parties' intentions, and interpreting the contract's terms in a factual vacuum would undermine that goal." *Dev. Specialists, Inc.*, 487 B.R. at 393 (collecting cases).

Here, in determining that the 2013 Commission Plan is ambiguous with respect to the Docomo Pre-Payment, the Court properly considered the plain terms of the Employment Agreement and the 2013 Commission Plan together with the context and circumstances surrounding the execution of the Employment Agreement (*see* Opinion & Order 16–17), as New York courts commonly do. *See, e.g.*, *Random Ventures, Inc. v. Advanced Armament Corp., LLC*, No. 12 Civ. 6792(KBF), 2014 WL 113745, at *37 (S.D.N.Y. Jan. 13, 2014) ("The context in which the [employment agreements] were executed is important to this Court's interpretation of [their] terms . . . ."); *Ga. Malone & Co., Inc. v. E & M Assocs.*, 163 A.D.3d 176, 187–88, 81 N.Y.S.3d 387 (1st Dep't 2018) (finding contract ambiguous "given the history between the parties, the language contained in the agreement, and the other relevant circumstances surrounding the execution of the agreement"); *Kang v. Kim*, 100 A.D.3d 514, 515, 954 N.Y.S.2d 71 (1st Dep't 2012) (internal quotation marks and alteration omitted) ("Upon examination of the settlement agreement in its entirety, and considering the relation of the parties and the circumstances under which it was executed, the agreement is ambiguous because the provision is reasonably susceptible of more than one interpretation." (collecting cases)); *Genovese v. Axel*, 40 A.D.3d 693, 694, 835 N.Y.S.2d 684 (2d Dep't 2007) ("In examining the agreement, the court should consider the relation of the parties and circumstances under which it was executed."). Dreni's argument that "any reference to a preexisting relationship [between PrinterOn and Docomo] . . . should be cast aside" (Pl.'s Recons. Reply 3) is therefore plainly meritless.

**B.  The Court Properly Considered Extrinsic Evidence Because
the Interpretations Urged by Both Parties Are Reasonable**

**1.  PrinterOn's Reading of the Employment Agreement and the 2013
Commission Plan Is a Reasonable Interpretation, and Dreni's Textual
Arguments to the Contrary Are Unsupported and Unconvincing**

First, interpreting the words "Expand relationship to Nomadix and NTT Docomo (parent)"

contained in the 2013 Commission Plan as limiting or "qualifying" Dreni's connection to Docomo

(*see* Opinion & Order 16) does not render Docomo meaningless, as Dreni argues (*see* Pl.'s Recons.

Mem. 12–13).  "Normally, where broad and specific language conflict, the specific language

would control."  *Bd. of Educ. v. CNA Ins. Co.*, 839 F.2d 14, 18 (2d Cir. 1988) (citing *John Hancock

Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983)).  Here,

the sub-language under particular partners/targets—Docomo, Verizon, and Konica Minolta—is

reasonably read as specific descriptions of Dreni's duties and responsibilities with respect to those

partners/targets and matters on which Dreni is entitled to commissions.  *See Bloom v. Rock*, No.

06 Civ. 6301(NRB), 2010 WL 2267468, at *5 (S.D.N.Y. May 27, 2010) ("[T]he 'Product Equity'

heading is clearly not to be interpreted in isolation; it is followed by a specific set of parameters

that frame the plaintiff's rights.").  Moreover, because several partners/targets have no sub-

language—LRS (Levi, Rey and Shoup), T-Mobile/AT & T, Ingram, Muratee, and American

Campus Communities—reading the sub-language as not limiting Dreni's connection to

partners/targets, as urged by Dreni, improperly would render the sub-language meaningless, an

interpretation that "is not preferred and will be avoided if possible."  *Garza v. Marine Transp.

Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988) (citing *Rothenberg v. Lincoln Farm Camp, Inc.*, 755

F.2d 1017, 1019 (2d Cir. 1985)) (finding district court erred where its interpretation "would have

the effect of rendering at least one clause superfluous or meaningless"); *cf. Malmsteen v. Universal

Music Grp., Inc.*, 940 F. Supp. 2d 123, 133 (S.D.N.Y. 2013) ("[I]nterpreting  'or other methods'

as [plaintiff] does—to be essentially limitless—would render superfluous both the specifically enumerated list in that section and the separate sub-section addressing the sale of Records through record clubs.").  Put differently, if Dreni were entitled to commissions on Docomo without limitation, there would be no reason to include the sub-language.

Second, Dreni attacks the Court's Opinion and Order by improperly raising arguments that were not raised in his opposition brief.  *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos., Inc.*, 265 F.3d 97, 115 (2d Cir. 2001) (affirming rejection of argument raised for the first time on a motion for reconsideration as untimely (collecting cases)).[1]  In any event, Dreni's new argument that his "'Target Market' comprised 'Channel Partners,' which indisputably included Docomo" (Pl.'s Recons. Mem. 13) is not persuasive.  The 2013 Commission Plan does not define "Channel Partners" (*see* Jt. 56.1 Ex. A at 12–14 [ECF No. 49-1]), so it is unclear which partners are Channel Partners.  Moreover, Dreni's sole support for his newly minted argument that Docomo is a Channel Partner is Dreni's own declaration (*see* Dreni Decl. ¶ 12 [ECF No. 64]), extrinsic evidence that cannot be considered in determining whether the contract language is ambiguous.  *See N.Y. Marine*, 599 F.3d at 144.

---

[1] Dreni argues that the Court should consider his "plain terms" arguments raised for the first time in his reconsideration motion because he "has consistently argued that plain terms govern" and "[r]econsideration standards specifically permit (a) re-addressing reasons that the Court overlooked or misapprehended the first time or (b) presenting additional reasons for why the Court's rationale cannot be reconciled with the plain terms argument." (Pl.'s Recons. Reply 4 n.3.) The Court disagrees. First, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . ." *Willoughby v. Peterson*, No. 3:10 CV 509(JGM), 2012 WL 3726532, *8 (D. Conn. Aug. 27, 2012) (citing *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). It is unreasonable for a litigant to argue broadly that the plain terms govern and expect the Court to think of every potential textual argument. Second, permitting a litigant to make broad, general arguments when briefing a dispositive motion and then make specific, refined arguments when moving for reconsideration would be inconsistent with the guiding principle that the standard for reconsideration should be narrowly construed to "prevent[] the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Sigmon v. Goldman Sachs Mortg. Co.*, 229 F. Supp. 3d 254, 257–58 (S.D.N.Y. 2017) (alteration in original) (quoting *Henderson v. Metro. Bank & Tr. Co.*, 502 F. Supp. 2d 372, 376 (S.D.N.Y. 2007)). Accordingly, specific "plain terms" arguments raised for the first time in Dreni's reconsideration motion are untimely and improper. *See Ideavillage Prods. Corp. v. A1559749699-1*, Nos. 20-cv-04679-MKV, 20-cv-04680-MKV, 20-cv-04681-MKV, 20-cv-04682-MKV, 20-cv-04683-MKV, 2020 WL 5663413, at *1 (S.D.N.Y. Sept. 23, 2020) ("Even a new argument regarding the decision in question is inappropriate if it could have been raised in the[] first motion." (citing *Shrader*, 70 F.3d at 257)).

Similarly, Dreni's argument that his "receipt of commissions on the Konica Minolta and Verizon accounts was not restricted in any way to the descriptions provided for in the sub-language" (Pl.'s Recons. Mem. 13) fails because it was not raised in his opposition brief. *See Stroh*, 265 F.3d at 115; *supra* note 1. Moreover, it relies on extrinsic evidence, which may not be considered at this stage of the analysis. *See N.Y. Marine*, 599 F.3d at 144.

Dreni's argument that subsequent commission plans specifically excluded certain commissions, while the 2013 Commission Plan failed to do so, and "it would be especially improper for the Court to construe that omission in favor of a sophisticated party like PrinterOn" (Pl.'s Recons. Mem. 14) similarly was not made in his opposition brief. *See Stroh*, 265 F.3d at 115; *supra* note 1. Dreni now asks the Court improperly to consider extrinsic evidence in determining whether the contract is ambiguous. *See N.Y. Marine*, 599 F.3d at 144. To the extent Dreni asks the Court to employ the principle of *contra preferentem*, that request is misplaced because "under New York law, courts should not resort to *contra proferentem* until after consideration of extrinsic evidence." *Int'l Multifoods*, 309 F.3d at 88 n.7 (collecting cases); *see also Dish Network Corp. v. Ace Am. Ins. Co.*, 431 F. Supp. 3d 415, 431 (S.D.N.Y. 2019) (noting that the doctrine of *contra proferentem* "is one of last resort, and should not be applied unless terms in the contract remain ambiguous" after considering extrinsic evidence (citing *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 (2d Cir. 1983))). It would therefore be improper to apply that principle in determining whether the contract is ambiguous. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001) (explaining that "*contra proferentem* does not come into play unless this court first determines that the contract is, in fact, ambiguous" (citing *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548, 634 N.Y.S.2d 669, 658 N.E.2d 715 (1995))).

Dreni improperly rehashes a series of previously rejected arguments.  "A motion for reconsideration is not a proper tool for a party dissatisfied with the court's ruling to merely relitigate issues previously determined by the court or reargue the same points that were previously raised and rejected."  *Gustavia Home, LLC v. Rice*, No. 16 Civ. 2353 (BMC), 2017 WL 3669007, at *1 (E.D.N.Y. July 12, 2017) (collecting cases); *see also Women's Integrated Network, Inc. v. U.S. Specialty Ins. Co.*, No. 08-CV-10518, 2011 WL 1347001, at *2 (S.D.N.Y. Apr. 4, 2011) ("The Court will not re-litigate the merits of the underlying dispute on a motion for reconsideration."), *aff'd*, 495 F. App'x 129 (2d Cir. 2012)).

Dreni argues that "if the parties intended as part of the 2013 Plan to limit Dreni's role to Nomadix and NTT Docomo expansion only, the simple course would be to name only the two affiliates as the targets."  (Pl.'s Recons. Mem. 14.)  The Court previously rejected this argument, which Dreni raised in his opposition brief.  (Pl.'s Opp. Summ. J. 8.)  *See Liburd*, 2009 WL 1605783, at *3.  In any event, the 2013 Commission Plan listed "partners/targets," and Docomo was a pre-existing partner of PrinterOn.  Thus, it is reasonable to read the 2013 Commission Plan as listing Docomo (partner) with sub-language specifying Dreni's duties and responsibilities to be to *expand* PrinterOn's relationship to Nomadix and NTT Docomo (targets).

Dreni's argument that he received commissions on Docomo revenue from "hardware, software, and services" (Pl.'s Recons. Mem. 15) fails because it was made in his opposition brief (Pl.'s Opp. Summ. J. 8), *see Liburd*, 2009 WL 1605783, at *3, and it relies on extrinsic evidence, which may not be considered at this stage, *see N.Y. Marine*, 599 F.3d at 144.  The argument, however, is baseless since the 2013 Commission Plain expressly provides for commissions on revenue from hardware, software, and services.  (*See* Jt. 56.1 Ex. A at 13.)

Finally, Dreni's argument that the merger clause prohibits consideration of extrinsic, or parol, evidence (Pl.'s Recons. Mem. 15), which was made in his opposition brief (Pl.'s Opp. Summ. J. 6, 9), *see Liburd*, 2009 WL 1605783, at *3, is meritless.  The Court used extrinsic evidence in its Opinion and Order to *interpret* the ambiguous terms of the 2013 Commission Plan. This does not run afoul of the merger clause or the parol evidence rule.  *See Topps*, 526 F.3d at 69 (emphasis added) (noting that "it is proper to consider extrinsic evidence in *interpreting* the ambiguous terms, irrespective of the parol evidence rule" (citing *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 571 (2d Cir. 1991))); *Garza*, 861 F.2d at 27 (noting that "[w]hen extrinsic evidence is considered for the purpose of *interpretation*, the parol evidence rule is inoperative" (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 n.2 (2d Cir. 1975)); *Alpha Capital Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 409 (S.D.N.Y. 2016) (considering extrinsic evidence to clarify meaning of contract terms despite merger clause).

## 2.  The 2013 Commission Plan Is Ambiguous with Respect to Both Dreni's Annual Personal Quota and Annual Company Target

The Court considered and rejected Dreni's argument distinguishing his "Annual Personal Quota" and the "Annual Company Target," which Dreni raised in his opposition brief.  (Pl.'s Opp. Summ. J. 9, 11–12).  *See Liburd*, 2009 WL 1605783, at *3.  Dreni's attempt to re-litigate this issue on reconsideration is improper.  *See Buczek v. Setrus LLC*, No. 16-CV-268S, 2017 WL 2021533, at *2 (W.D.N.Y. May 12, 2017) (denying reconsideration where plaintiff "simply reargue[d] and reiterate[d] her baseless positions and continue[d] to extol irrelevant theories"); *Banco de Seguros Del Estado v. Mut. Marine Offices, Inc.*, 230 F. Supp. 2d 427, 431 (S.D.N.Y. 2002) (denying reconsideration motion where plaintiff "reargue[d] the points it made during the initial briefing").  The 2013 Commission Plan is ambiguous generally with respect to the "Annual Company Target."

First, because the 2013 Commission Plan is an exhibit to the Employment Agreement, the law dictates that the two must be construed together. *See This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together." (collecting cases)). Section 3.2 of the Employment Agreement provides: "Commission. In addition, the Employee will receive commission based upon sales revenue procured in the Employee's *assigned market space* as detailed in Exhibit A." (*See* Jt. 56.1 Ex. A at 4 (emphasis added).) Although the phrase "assigned market space" is undefined, the term "assign" means "to fix or specify in correspondence or relationship," *Assign*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/assign (last visited Sept. 2, 2021), or "to designate; name; specify," *Assign*, DICTIONARY.COM, https://www.dictionary.com/browse/assign (last visited Sept. 2, 2021). The Employment Agreement therefore entitles Dreni to commissions on revenue procured in a *specifically designated market space* in the 2013 Commission Plan. The 2013 Commission Plan does not specifically use the term "market space" but refers to "Target Market" and lists "Specific partner/targets." (*See* Jt. 56.1 Ex. A at 12.) Thus, it is reasonable to infer that the "Target Market" and "Specific partners/targets" constitute Dreni's assigned market space, entitling Dreni to commissions on "revenue procured" in those areas. (*See id.* at 4.) In the 2013 Commission Plan, "Annual Company Target" refers to "Revenue," but "Revenue," like most other terms relevant to Dreni's commissions calculations, is undefined. *See One Source Envtl., LLC v. M + W Zander, Inc.*, No. 2:12-cv-145, 2015 WL 7428572, at *7 (D. Vt. Nov. 20, 2015) ("Given the contract's use of multiple, undefined terms to describe those items that are subject to a commission, reasonable minds could undoubtedly disagree as to the intent of the parties."). Reading "Annual Company Target" as encompassing all PrinterOn revenue would be inconsistent with the Employment Agreement's specific designation of Dreni's "assigned market space."

Inconsistent, or conflicting, provisions like this suggest ambiguity. *See Seiden Assocs.*, 959 F.2d at 429; *Fed. Ins. Co. v. Ams. Ins. Co.*, 258 A.D.2d 39, 43, 691 N.Y.S.2d 508 (1st Dep't 1999) (noting that "internal inconsistencies in a contract point[] to ambiguity"). Reading "Annual Company Target" and "Revenue" narrowly to encompass only revenue procured from Dreni's "Target Market" and "Specific partner/targets" avoids this inconsistency and is therefore reasonable. *See DiPizio Constr. Co.*, 120 A.D.3d at 907 (alteration in original) ("[W]here two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect." (quoting *Burgdorf v. Kasper*, 83 A.D.3d 1553, 1555, 921 N.Y.S.2d 769 (4th Dep't 2011))); *cf. Lynch v. Inter-Cty. Bldg. Materials Corp.*, No. CV 05–01801 (DRH) (GRB), 2013 WL 5652524, at *9 (E.D.N.Y. Oct. 15, 2013) (finding two constructions reasonable where term was undefined).

Second, the 2013 Commission Plan provides, "Hardware revenue will count toward your Annual Personal Quota and toward the Annual Company Target as long as minimum revenue per unit is maintained." (*See* Jt. 56.1 Ex. A at 13.) This further suggests that "Annual Company Target" does not encompass all PrinterOn revenue. If, as Dreni argues, "Annual Company Target" encompassed all PrinterOn revenue, then there would be no need to expressly state that hardware revenue counts toward the "Annual Company Target." *See Malmsteen*, 940 F. Supp. 2d at 133 (noting that "an interpretation rendering contractual provisions redundant or superfluous is disfavored" (citing *Int'l Multifoods*, 309 F.3d at 86; and *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 332 (S.D.N.Y. 2010))); *cf. JA Apparel Corp. v. Abboud*, 568 F.3d 390, 399 (2d Cir. 2009) (finding that a redundancy made an "unadorned word" ambiguous).

Third, construing "Annual Company Target" to include the Docomo Pre-Payment would lead to a commercially unreasonable result. "A court should not interpret a contract in a manner

that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" *Samba Enters., LLC v. iMesh, Inc.*, No. 06 Civ. 7600, 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009) (quoting *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (1st Dep't 2003); and citing *Mionis v. Bank Julius Baer & Co.*, 301 A.D.2d 104, 109, 749 N.Y.S.2d 497 (1st Dep't 2002)). Considering that Docomo signed the letter of intent in February 2012, that PrinterOn had been working to close the Docomo Pre-Payment for months before Dreni joined PrinterOn, and that the deal could close immediately after Dreni signed the Employment Agreement, it would be commercially unreasonable for PrinterOn to apply the Docomo Pre-Payment to Dreni's "Annual Company Target." If it did, nearly twenty percent of Dreni's $5.2 million "Annual Company Target" would be satisfied through a single deal to which Dreni did not contribute. As Dreni argues, inclusion of the Docomo Pre-Payment would entitle Dreni to $146,446 (Pl.'s Recons. Reply 5 n.4), which is more than his 2013 "Base Salary" (*see* Jt. 56.1 Ex. A at 4)—a commercially unreasonable, and borderline absurd, result. *See Barrow v. Lawrence United Corp.*, 146 A.D.2d 15, 20–21, 538 N.Y.S.2d 363 (3d Dep't 1989) ("Courts avoid construing an agreement in a manner that would effectively require double compensation or produce other unreasonable or unfair results." (collecting cases)); *see also Namad v. Salomon, Inc.*, 74 N.Y.2d 751, 753, 543 N.E.2d 722, 545 N.Y.S.2d 79 (1989) (noting that "plaintiff's argument that the bonus clause entitles him to payments approximately equal to his previous annual salary of $170,000 is unpersuasive as the parties would be expected to make reference to such a large sum of money in the agreement with particularity" (citing *Braten v. Bankers Tr. Co.*, 60 N.Y.2d 155, 162, 468 N.Y.S.2d 861, 456 N.E.2d 802 (1983))); *cf. Simas v. Merrill Corp.*, No. 02 Civ.4400 RCC, 2004 WL 213013, at *4 (S.D.N.Y. Feb. 4, 2004) (rejecting interpretation that would lead to

"absurd results"—"a windfall for plaintiff; entitling him to commissions several years beyond his resignation").

Finally, Dreni argues that the issues of whether the Docomo Pre-Payment applies to his "Annual Personal Quota" and "Annual Company Target" must be considered separately. (Pl.'s Recons. Mem. 17.) However, it is incumbent on the Court to consider the Employment Agreement and 2013 Commission Plan holistically and give effect to the interrelationship of Dreni's Annual Personal Quota and his Annual Company Target. *See Seiden Assocs., Inc.*, 959 F.2d at 429 (finding that the district court "erroneously emphasized the import of the final fee portion at the expense of the earned compensation portion of the letter contract and thereby ignored alternative reasonable interpretations of how the two provisions interrelate"); *see also Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993) (finding contract "ambiguous because the interrelationship of these two provisions is susceptible to different reasonable interpretations" (citing *Seiden*, 959 F.2d at 430)). Thus, just as the text of the 2013 Commission Plan is ambiguous as to whether the parties intended for the Docomo Pre-Payment to be included in Dreni's "Annual Personal Quota," so too is it ambiguous as to whether the parties intended it to be included in his "Annual Company Target."[2]

*     *     *

For the foregoing reasons, the Court confirms its holding that the text of the Employment Agreement and the 2013 Commission Plan is ambiguous with respect to whether the Docomo Pre-

---

[2] Dreni argues that "PrinterOn's claim that the $1 million in Docomo prepayment was excluded from the Company Target would lead to the absurd result that there was one target for the company and a special, alternate company number for Dreni." (Pl.'s Recons. Mem. 17 n.3.) But as noted above, "Revenue" under "Annual Company Target" is undefined. Furthermore, without reference to extrinsic evidence, the Court does not know how compensation plans of other PrinterOn employees are structured. It is reasonable to think that Dreni, a salesman, would have a different "Annual Company Target" than Cunningham, PrinterOn's Chief Executive Officer and President. Indeed, it is reasonable to think that not all employees share the same "assigned market space." (Jt. 56.1 Ex. A at 4.)

Payment was to be included in Dreni's commissions calculations.  The interpretation urged by PrinterOn—that the parties did not intend for the Docomo Pre-Payment to be included in Dreni's commissions calculations—is reasonable.  *See Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 122 (2d Cir. 1985) (finding language ambiguous where the court "cannot say that the construction urged by [defendant] is not a 'fairly reasonable' one under the circumstances").

Because the text of the Employment Agreement and the 2013 Commission Plan is ambiguous with respect to the Docomo Pre-Payment, the Court properly considered extrinsic evidence.  As the Court previously ruled in granting summary judgment in favor of PrinterOn (Opinion & Order 17–19) and as discussed below, the relevant extrinsic evidence illuminating the parties' intended meaning of the Employment Agreement and the 2013 Commission Plan with respect to the Docomo Pre-Payment is "so one-sided" in favor of PrinterOn "that no reasonable person could decide to the contrary."  *N.Y. Marine*, 559 F.3d 102 (quoting *Compagnie Financiere*, 232 F.3d at 158).

## C. The *Relevant* Extrinsic Evidence Makes Clear That the Parties Never Intended for Dreni to Receive Commissions on the Docomo Pre-Payment

The Court found that overwhelming extrinsic evidence makes clear that the parties did not intend for Dreni to receive commissions on the Docomo Pre-Payment.  (Opinion & Order 17–19.) Dreni's attempt to marshal previously available, irrelevant evidence is unavailing and certainly does not warrant reconsideration.  *See Pearlstein v. Blackberry Ltd.*, No. 2:13-cv-07060 (CM) (KHP), 2019 WL 6977157, at *3 (S.D.N.Y. Dec. 19, 2019) (denying reconsideration where motion "present[ed] th[e] Court with no new evidence"); *Watson v. United States*, No. 04 Civ. 2222 RWS, 2005 WL 356813, at *2 (S.D.N.Y. Feb. 14, 2005) (denying reconsideration where plaintiff "pointed to no new evidence or evidence overlooked in connection with the decision rendered in the Opinion").  The Court did not overlook Dreni's evidence; his evidence was irrelevant and did

not rebut the clear conclusion that PrinterOn's interpretation was the interpretation intended by the parties at the time of contracting. *See Gurney's Inn Resort & Spa Ltd. v. Benjamin*, 878 F. Supp. 2d 411, 414 (E.D.N.Y. July 20, 2012) (finding summary judgment proper where "extrinsic evidence is itself capable of only one interpretation" and defendant "point[ed] to no extrinsic evidence to rebut th[e] overwhelming showing by plaintiff").

Under New York law, "the objective of contract interpretation is to give effect to the *expressed* intentions of the parties." *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 467 (quoting *Hunt*, 889 F.2d at 1277). "When interpreting the meaning of a contract, it is the objective intent of the parties that controls . . . ." *Dish Network L.L.C. v. Am. Broad. Cos.* (*In re AutoHop Litig.*), No. 12 Civ. 4155(LTS)(KNF), 2013 WL 5477495, at *8 (S.D.N.Y. Oct. 1, 2013) (quoting *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)). The "exclusive reliance" of New York courts "upon evidence of objective manifestations of intent renders evidence of uncommunicated subjective intent irrelevant." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998); *see SSP Capital Partners, LLC v. Mandala, LLC*, 715 F. Supp. 2d 443, 451 (S.D.N.Y. 2009) ("Under New York law, only objective manifestations of intent are deemed relevant." (citing *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 378 (S.D.N.Y. 2006), *aff'd*, 284 F. App'x 822 (2008))). Accordingly, when considering extrinsic evidence to determine the intended meaning contracting parties assigned to ambiguous language, evidence of a party's unexpressed, or uncommunicated, subjective intent should not be considered. 28 N.Y. Prac., Contract Law § 9:35 (collecting cases); *see also Faulkner*, 452 F. Supp. 2d at 378 (noting that "statements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract" (collecting cases)); *Nycal*, 988 F. Supp. at 301 ("[W]hen resolving disputes concerning the meaning of ambiguous contract language, unexpressed

subjective views have no proper bearing." (collecting cases)); *Hotchkiss v. Nat'l City Bank of N.Y.,* 200 F. 287, 294 (S.D.N.Y. 1911) (Hand, *J.*) (emphasis added) ("Yet the question always remains for the court to interpret the reasonable meaning to the acts of the parties, by word or deed, and *no characterization of its effect by either party thereafter, however truthful, is material.*"), *aff'd sub nom.*, *Ernst v. Mechs.' & Metals Nat'l Bank of N.Y.C.*, 201 F. 664 (2d Cir. 1912), *aff'd sub nom.*, *Nat'l City Bank of N.Y. v. Hotchkiss*, 231 U.S. 50 (1913).

It is also well established in New York law that the Court's "role in interpreting a contract is to ascertain the intention of the parties *at the time they entered into the contract*." *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 775 N.Y.S.2d 757, 807 N.E.2d 869 (2004) (emphasis added); *see also Credit Suisse Secs. (USA) LLC v. Grand Circle LLC*, No. 11 Civ. 0232(JGK), 2013 WL 5312511, at *11 (S.D.N.Y. 2013) (noting that "a court's role is to give effect to the intent of the parties 'as it existed *at the time the contract was executed*'" (quoting *U.S. ex rel. Falco Constr. Corp. v. Summit Gen. Contracting Corp.*, 760 F. Supp. 1004, 1013 (E.D.N.Y. 1991))). Accordingly, the Second Circuit has repeatedly instructed that when a contract is ambiguous, courts should consider extrinsic evidence that evinces the parties' intent at the time of contracting. *See Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 148 (2d Cir. 2017); *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003); *Wards Co.*, 761 F.2d at 122.

As discussed, Dreni's proffered evidence violates each of these cardinal rules of contract construction.  By contrast PrinterOn identifies several items in the record reflecting the parties' mutual intent and understanding during negotiations and at the time of contracting that the Docomo Pre-Payment would be excluded from Dreni's commissions calculations.  It is undisputed that PrinterOn and Dreni negotiated the terms of his contract for more than six weeks before it was executed on June 22, 2012.  (Pl.'s Resp. Def.'s 56.1 ¶ 16 [ECF No. 57].)  During the negotiations,

Noreikis advised Dreni that the Docomo Pre-Payment would be excluded from his commissions calculations.  On June 2, 2012, Noreikis sent Dreni a model compensation plan that listed Docomo under Dreni's "Initial Personal Accounts" with the comment "Incremental net revenue, pre-payment does not apply to company target."  (Salmon-Smith Decl. Supp. Ex. P at 2 [ECF No. 52-16]; *see* Salmon-Smith Decl. Supp. Ex. O at 2 [ECF No. 52-15].)  In response, Dreni inquired, "Why are we leaving out any prepayment from Docomo from the company number?," to which Noreikis replied:

> Two reasons.  It is not in the budget of 5.2 and I have to pay someone else. If we put Docomo in the budget, the company number would be $6.2. However the hardware that will ship to support the subscriptions will apply to your personal and company number.  Make sense?

(Salmon-Smith Decl. Supp. Ex. E at 2 [ECF No. 52-5].)  Dreni did not challenge the exclusion of the Docomo Pre-Payment from his commissions calculations.  (*See* Salmon-Smith Decl. Supp. Ex. Q at 2 [ECF No. 52-17].)  Indeed, in a subsequent e-mail, Dreni commented on and suggested revisions to a draft of the Employment Agreement and 2013 Commission Plan without referencing Docomo or objecting to Noreikis's answer that Dreni's commissions calculations would not include the Docomo Pre-Payment.  (*See* Salmon-Smith Decl. Supp. Ex. F at 2–3 [ECF No. 52-6].)

Moreover, Noreikis testified in his deposition:

> A.  *The conversation I remember having with Denis on Docomo was that* I had a material project that was going to close, was likely going to close with Docomo.  I didn't know if the [Docomo] contract was going to sign days before [Dreni] started or two days after he started, and that *for purposes of compensation plan, the million dollar project at Docomo would not accrue to a sales compensation for either the personal number or the company number.*
>
> Q.  And do you recall Mr. Dreni ever – him raising his concerns about that with you?
>
> A.  I believe he raised his concerns before he came on board.  I believe *I actually followed up with documentation on why it was not going to be*

> *included in his compensation.*  So, yes, he did raise a concern, and he raised
> – I remember him raising the concern before he came on board.
>
> Q.  So your testimony is that *Mr. Dreni, with respect to that one million
> dollars, would not – you had clearly communicated to him that he would
> not be entitled to that account and any commissions based on revenue or
> invoicing from that account for both his personal target and his company
> target?*
>
> A. *Correct.*

(Salmon-Smith Supp. Decl. Ex. I at 3, 87:8–88:9 [ECF No. 52-9] (emphasis added); *see* Pl.'s Resp.

Def.'s 56.1 ¶¶ 41–42.)

E-mails between Dreni and Noreikis after execution of the Employment Agreement shed

further light on the joint intent and understanding of the parties *at the time of contracting*.[3]  On

January 15, 2013, Dreni e-mailed Noreikis inquiring about commissions calculations under his

company number and acknowledging that he had agreed that, under the 2013 Commission Plan,

the Docomo Pre-Payment would be excluded from his company number:

> *I agreed with you, that Docomo will not be part of my company number*,
> even though from a personal perspective and as good businessman to myself
> and my family the deal I agreed with you did not add-up logically to me
> because it is a company number and after my signature, I become part of
> the company.  Regardless of Denis logic, *I still agreed with you as a
> gentleman and in contract,* since you asked me and I honored it the whole
> way.

(Salmon-Smith Decl. Supp. Ex. X at 2 (emphasis added).)

On May 7, 2013, Dreni e-mailed Noreikis "a quick recap of [their] conversations back from

May/June 2012 before and after signing the contract":

> 2. Denis will have a corporate number of 5.2 million including every
> invoiced opportunity of PrinterOn from May 1st to April 30th 2013 . . .

---

[3] Dreni's attempt to discredit e-mails in the record as "incomplete and lacking context" (Pl.'s Recons. Mem. 19) and "[o]verwhelmingly contradictory and context-heavy" (Pl.'s Recons. Reply 1–2) is unavailing. The record is clear that in January 2013, Dreni became frustrated upon learning that his company number would be adjusted to reflect a ten-month year because he joined PrinterOn two months into fiscal year 2013. (*See* Salmon-Smith Decl. Supp. Ex. X at 2 [ECF No. 52-24]; Salmon-Smith Decl. Supp. Ex. W at 4–7 [ECF No. 52-23].)

> *- Docomo is taken out of the corporate number, under the assumptions that it might close before Denis gets on board . . . .*

(Salmon-Smith Decl. Supp. Ex. W at 4 (emphasis added).).  On May 10, 2013, Noreikis replied, in relevant part:

> *Docomo was excluded from day one and is not included in the $5.2M company target nor in Denis variable compensation. . . .*
> *Docomo was taken out of Denis corporate number because we assumed it would close after Denis came on board.*  There is a real
> material cost of sales associated with Docomo.  It was not and is not appropriate for Denis to personally benefit from Docomo.  *This is consistent with every expectation set. . . .*
> Denis variable compensation excludes credit for Docomo. . . .
>
> Denis corporate number is simple.  The number was adjusted to reflect a 10 month year.  *Docomo is NOT included in any variable compensation for Denis.  This was clearly articulated from day one and is stated in the employment contract. . . .*

(*Id.* at 4–6 (emphasis added).)  On May 14, 2013, Dreni replied, in relevant part, acknowledging

that his contract did not entitle him to commissions on the Docomo Pre-Payment:

> ***I am NOT asking*** *for you to include the Docomo number as part of my FY13 commission benefit. . . . I will honor that agreement that you asked of me till the end.*  (*it is not in my contract btw, I never thought it was.*  On the contrary Docomo was part of my targeted accounts).
> Regardless how Docomo was used to incentivize me to join, *I am not asking to benefit from the million of DoCoMo.*  I hope this is clear.

(*Id.* at 3 (emphasis added).)  Later that day, Noreikis responded:

> *Denis was not held accountable or responsible for the Docomo number, in your personal target or company number.*
> *We specifically excluded the Docomo number from the quota responsibility*, even though we knew there was a high likelihood it would close. (no responsibility/no reward)
> *The compensation plans were implemented with this clear understanding and expectation.  The 5.2M company target excluded the Docomo number from the budget/responsibility plan.*
> It is not a position that I can support, to now go back and have Denis personally benefit the Docomo billing.

(*Id.* at 2 (emphasis added).)  In the final message in this e-mail chain, Dreni pleads with Noreikis

to include the Docomo Pre-Payment in his company number so that he receives commissions on

the $5.5 million company number and argues that there is wiggle room in the contract for Noreikis

to do so:

> Again, I am not asking to be paid commission on the 1 million dollar
> Docomo order.  This has nothing to do with my personal number.  This has
> only to do with the company number . . . .
>
> 1- We can use the contract - Nothing mentioned in the contract that the
> docomo number will be removed from the Corporate accelerators (*again I
> will hold to the gentleman agreement that Docomo even though my account
> in the corporate account, will not count as my personal number.
> Agreed*)
> 2- We can use the clause of all invoicable [sic] revenue in this FY will be
> part of the Company number (6.5 million)
> 3- We can use the fact that I was on board for over 3 months before the
> Docomo deal closed
> - I was introduced to the Docomo GM and VP's at the show on
>   my first day on the job
> - *Even though I knew that this would not be part of my personal
>   comp plan*, we spend many hours strategizing through it because
>   it was part of PrinterOn overall benefit and number . . . .

(*Id.* (emphasis added).)

Finally, on May 22, 2013, Noreikis sent Dreni an e-mail stating, *inter alia*, that "[a]s

discussed, Docomo does not apply to company or personal compensation."  (Salmon-Smith Decl.

Supp. Ex. Y at 2 [ECF No. 52-25].)  In his reply later that day, Dreni complained about his

commission calculations and noted that his "*standard comp plan*(pulled out of the drawer 10

months after signing), . . . *was driven my* [sic] *multiple exceptions*" and that prorating his

commissions for the month of June 2012 was "one more *exception to Denis comp not in his favor*."

(*Id.* (emphasis added).)

This unrebutted record evidence strongly supports PrinterOn's interpretation that the

parties' intended and understood at the time of contracting that the Docomo Pre-Payment would

be excluded from Dreni's commissions calculations.  This is the only reasonable interpretation.
*See Bank of N.Y. Tr., N.A. v. Franklin Advisers, Inc.*, 674 F. Supp. 2d 458, 470 (S.D.N.Y. 2009)
(granting summary judgment where the extrinsic evidence was "one-sided in favor of Franklin
Advisers' interpretation and that no reasonable jury could find for the Claimants on this issue");
*Consol. Edison, Inc. v. Ne. Utils.*, 332 F. Supp. 2d 639, 649–50 (S.D.N.Y. 2004) (finding summary
judgment proper where "the extrinsic evidence overwhelmingly confirms that the parties did not
intend to release . . . the $1.1 billion claim now at issue").  Where, as here, "the party moving for
summary judgment on a breach of contract claim submits evidence that supports its construction
of the agreement and defeats the construction urged by its adversary, the opposing party must
present extrinsic evidence in evidentiary form to support its construction of the agreement."  28
N.Y. Prac., Contract Law § 9:37 (citing *1375 Equities Corp. v. Buildgreen Sols., LLC*, 120 A.D.3d
783, 992 N.Y.S.2d 288 (2d Dep't 2014)).  Dreni failed to do so at the summary judgment stage,
and while reconsideration is an improper mechanism to attempt to do so (and for that reason alone
this motion should be denied), he fails to do so even in his reconsideration motion.

In his reconsideration papers, Dreni relies on ten items in the record.  (Pl.'s Recons. Mem.
2–3, 21–22; *see* Pl.'s Recons. Reply 6–9.)  Some of these items were raised in his opposition brief
(*see* Pl.'s Opp. Summ. J. 8–12), some were not.  In either case, they are not a basis for seeking
reconsideration and in any event, they do not create a genuine issue of material fact.

First, Dreni claims that Noreikis's soliciting Dreni's input in Docomo negotiations before
he was hired and inviting him to meet Docomo representatives immediately after his hiring led
him to understand that he would receive commissions on the Docomo Pre-Payment.  (Pl.'s Recons.
Mem. 21; Pl.'s Opp. Summ. J. 10–11; *see* Dreni Decl. Opp. Exs. B–H [ECF Nos. 64-2 to 64-8].)
This amounts to nothing more than uncommunicated subjective intent, which is "immaterial in

25

construing the terms of the contract." *Faulkner*, 452 F. Supp. 2d at 378 (collecting cases). Dreni points to no evidence in the record—and the Court has found none—that he communicated this alleged understanding to Noreikis or anyone at PrinterOn prior to or during execution of the Employment Agreement. Rather, the unrebutted record evidence submitted by PrinterOn demonstrates Dreni was told that the Docomo Pre-Payment would *not* be part of his commission. (*See* Opinion & Order 17.) *Supra* pp. 20–24. Specifically, Dreni fails to rebut evidence that Noreikis made clear to Dreni during negotiations that Docomo would not be included in his commissions calculations.[4] Accordingly, Dreni's so-called extrinsic evidence of undisclosed subjective intent is not relevant and therefore cannot create a triable issue of fact. *See Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1003 (2d Cir. 1974) (holding that parties' "subjective or hidden intent is not competent to determine the meaning of the words they employed" (collecting cases)); *Faulkner*, 452 F. Supp. 2d at 377–78 (finding that deposition

---

[4] In his Local Rule 56.1 Counterstatement, Dreni disputes PrinterOn's assertion that he did not challenge the exclusion, claiming:

> Plaintiff had various communications, including a number of phone calls, with Noreikis between the time of the June 2, 2012, email and the signing of the Employment Agreement. Plaintiff specifically challenged the exclusion, and the exclusion was not part of the Employment Agreement or 2013 Commission Plan. Plaintiff incorporates by reference paragraphs 122–125 of his Additional Statements of Facts as referenced below.

(Pl.'s Resp. Def.'s 56.1 ¶ 40.) Dreni cites no record evidence to support his claim that he challenged the exclusion. Paragraphs 122–125 make textual arguments for why Dreni believes the Docomo Pre-Payment should be included in his commissions calculations. (*Id.* ¶¶ 122–25.) Paragraph 124 cites to paragraph 12 of Dreni's own declaration, which post-dates PrinterOn's summary judgment motion, where he states, "Docomo was also a 'Channel Partner,' which the 2013 Commission Plan further identified, consistent with my discussions with Noreikis, as part of my 'Target Market.'" (Dreni Decl. Opp. ¶ 12; *see* Pl.'s Resp. Def.'s 56.1 ¶ 124.) This self-serving statement in Dreni's declaration cannot create a genuine issue of material fact with respect to the parties' joint intent and understanding leading up to and at the time of contracting. *See, e.g.*, *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." (citing *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969))); *BanxCorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 299 (S.D.N.Y. 2013) (noting that "a self-serving, contradictory affidavit fails to raise a triable issue of fact when it conflicts with documentary evidence" (quoting *Christiana Bank & Tr. Co. v. Dalton*, No. 06–CV–3206, 2009 WL 4016507, at *4 (E.D.N.Y. Nov. 17, 2009); and citing *Dzanoucakis v. Chase Manhattan Bank, USA*, No. 06–CV–5673, 2009 WL 910691, at *8 (E.D.N.Y. Mar. 31, 2009))); *see also Sayers*, 7 F.3d at 1096 (finding affidavit "immaterial to any determination of the parties' intent" because it was "argumentative and conclusory" and "deal[t] primarily with the intent of [defendant] rather than the joint intent of the parties").

testimony and affidavits could "not save plaintiffs from summary judgment" because there was no "evidence that they conveyed their alleged understandings and intentions . . . in the course of entering into the relevant contracts"); *Nycal*, 988 F. Supp. at 302 (finding that "the only testimonial evidence presented by either party that is properly considered is the testimony . . . concerning objective expressions of the parties' intent made during the negotiations").

Second, Dreni's testimony that the Docomo Pre-Payment was a "big incentive" for him to join PrinterOn (Pl.'s Recons. Mem. 21; Cassubhai Decl. Opp. Ex. 2 at 5, 83:25–84:2 [ECF No. 63-2]; *see* Salmon-Smith Decl. Supp. Ex. W at 3) is again a self-serving attestation of an uncommunicated subjective intent that is not relevant and is not properly considered. *See Pan Am. World Airways*, 505 F.2d at 1003; *Faulkner*, 452 F. Supp. 2d at 377–78; *see also Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09–cv–1410 (KAM)(RLM), 2013 WL 1334271, at *12 (E.D.N.Y. Mar. 28, 2013) (declining to consider proffered evidence of uncommunicated subjective intent); *Nycal*, 988 F. Supp. at 302–03 (declining to consider testimonial evidence that "reflects subjective intent or understanding only").

Third, Dreni argues that Noreikis made "conflicting representations about Docomo Pre-Payment entitlement" during negotiations.  (Pl.'s Recons. Mem. 21.)  Dreni relies on (1) his own deposition testimony where, when questioned on Noreikis's e-mail advising him that the Docomo Pre-Payment was excluded from his commission calculations, Dreni testified that "this is famous flip-flop Ken" (Cassubhai Decl. Opp. Ex. 2 at 5, 83:21–22) and (2) Dreni's declaration stating that he "stressed to Noreikis that the pre-payment deal being negotiated with Docomo was very important to [him] and was a big incentive for me to join the company . . . and thus it would need to be included in [his] 2013 Commission Plan." (Dreni Decl. Opp. ¶ 10.)  But Dreni's self-serving deposition testimony and declaration are completely unsupported by the record and therefore

cannot create a genuine issue of material fact.  *See, e.g., Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (summary order) (finding self-serving deposition testimony unsupported by admissible evidence insufficient to defeat summary judgment); *Dzanoucakis*, 2009 WL 910691, at *8 (finding that where "the uncontroverted record clearly supports a [particular] finding [regarding] the parties' agreement . . . [p]laintiff's own self-serving declaration to the contrary is insufficient, under the circumstances, to raise a triable issue of fact").

Fourth, Dreni argues in a conclusory manner for the first time in seeking reconsideration that there are issues of fact as to "what Noreikis intended by the June 2, 2012 email [with the model compensation plan], whether this e-mail was based on facts or in good faith, how the negotiations evolved over time, and why PrinterOn listed Docomo in the contract."  (Pl.'s Recons. Reply 7.)  It cannot reasonably be disputed that Noreikis intended that the Docomo Pre-Payment would be excluded from Dreni's commissions calculations.  (*See* Salmon-Smith Decl. Supp. Ex. E at 2.) Dreni did not contest this at the time.  *See supra* note 4.  Moreover, the draft commission plans contain the exact same language as the 2013 Commission Plan with respect to Docomo.  (*Compare* Dreni Decl. Opp. Ex. 3 at 4, 12 [ECF No. 64-3], *with* Jt. 56.1 Ex. 1 at 4, 12.)  Dreni's other conclusory concerns do not raise a triable issue of fact because they are unsupported by the record.

Fifth, Dreni argues that Noreikis falsely represented to Dreni that commissions on the Docomo Pre-Payment were not in the budget because PrinterOn needed to pay someone else— that is, Jeff Dwyer.  (Pl.'s Recons. Mem. 21; Pl.'s Recons. Reply 7.)  Dreni made this argument in his opposition brief (Pl.'s Opp. Summ. J. 11), and it is abusive for Dreni to simply rehash his arguments in a reconsideration motion.  *See Liburd*, 2009 WL 1605783, at *3.  Regardless, this argument is, as PrinterOn points out, a red herring and does not create an genuine issue of fact. (Def.'s Recons. Opp. 21.)  Whether PrinterOn intended to pay or actually paid commissions to

Dwyer is irrelevant to the parties' joint intent and understanding regarding the Docomo Pre-Payment and Dreni's commissions calculations.

Sixth, Dreni's argument that he received commissions on other accounts that had closed before his hire and that he did not help close (Pl.'s Recons. Mem. 22) was not raised in Dreni's opposition brief and is not properly raised in support of reconsideration. *See Stroh*, 265 F.3d at 115. In any event, the Docomo Pre-Payment was a discrete issue that the parties specifically negotiated. How the parties treated other accounts has no bearing on the parties' intent with respect to the Docomo Pre-Payment at the time of contracting.

Seventh, Dreni again relies on an October 2012 e-mail from Holly Snider, PrinterOn's Head of Human Resources, to Margaret Ritchie, PrinterOn's Director of Finance, stating, "I'm pretty sure that $5,200,000 estimate for the current year includes Docomo" (Pl.'s Recons. Mem. 22; *see* Dreni Decl. Ex. I at 2 [ECF No. 64-9]; Salmon-Smith Decl. Supp. Ex. 1 at 2 [ECF No. 71-1]), which Dreni cited in his opposition brief (Pl.'s Opp. Summ. J. 11–12 [ECF No. 54]). *Liburd*, 2009 WL 1605783, at *3. Since neither Ritchie nor Snider were involved in Dreni's contract negotiations, this after-the-fact statement sheds no light on the parties' intent and understanding regarding the Docomo Pre-Payment during negotiations and at the time of contracting and, as such, does not raise a genuine issue of material fact.[5] The record makes clear that the e-mail correspondence between Ritchie and Snider is "nothing more than *post hoc* interpretations of the [2013 Commission Plan] by [PrinterOn] employees who . . . are not even alleged to have participated in drafting or negotiating [Dreni's] contract[]," and "[s]uch legal conclusions are

---

[5] Ritchie testified that Snider "was involved in the compilation of the employment agreement and the discussions that occurred" (Cassubhai Decl. Opp. Ex. 4 at 12–13, 94:19–95:9 [ECF No. 63-4]), which is consistent with Cunningham forwarding to Snider his e-mail correspondence with Dreni with the note "[f]or your files" (Salmon-Smith Decl. Supp. Ex. 1 at 24). But in negotiating the Employment Agreement and the 2013 Commission Plan, Dreni dealt almost exclusively with Noreikis. (*See* Dreni Decl. ¶¶ 4, 8; Salmon-Smith Decl. Supp. Ex. Y at 2 (Dreni writing to Noreikis, "you are the only single point of contact that has been with me since April and are aware of all the conversations we have had").)

inadmissible and may not be considered on a motion for summary judgment." *Faulkner*, 452 F.

Supp. 2d at 379 (citing *Ward v. Nat'l Geographic Soc'y*, 208 F. Supp. 2d 429, 439–40 & n.58

(S.D.N.Y. 2002); and *Evans v. Port Auth.*, 192 F. Supp. 2d 247, 262 & n.16 (S.D.N.Y. 2002)); *see*

*RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, No. 10 Civ. 0025(PGG), 2013 WL

1294515, at *8 (S.D.N.Y. Mar. 30, 2013) (holding that certain "employees who testified on this

subject are not alleged to have been involved in the drafting or negotiation of the Indenture, and

their post hoc explanation of their subjective understanding of the Indenture's terms 'may not be

considered on a motion for summary judgment'" (quoting *Faulkner*, 452 F. Supp. 2d at 379)).

And "even if the statements were admissible, they constitute only 'unilateral expression[s] of one

party's postcontractual subjective understanding of the terms of the agreement and,

therefore, . . . [are] not probative as an aid to the interpretation of the contract.'" *Id.* (quoting

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 207 n.10 (2d Cir. 2005);

and collecting sources); *see also Doe v. Nat'l Bd. of Podiatric Med. Exam'rs*, No. 03 Civ.

4034(RWS), 2004 WL 912599, at *7 & n.8 (S.D.N.Y Apr. 29, 2004) (finding that defendant "has

not pointed to any extrinsic evidence that would be relevant to a determination of the parties'

intent" and rejecting two "items [that] post-date the formation of the agreements" because "neither

provide[d] relevant information as to [defendant's] intent as of the time the agreement was formed,

as required" (citing *British Int'l Ins. Co. Ltd.*, 342 F.3d at 82; and *Int'l Multifoods*, 309 F.3d at

83)).   Accordingly, the e-mail correspondence between Ritchie and Snider does not create a

genuine dispute of material fact.  *See Wells v. Shearson Lehman/Am. Express, Inc.*, 72 N.Y.2d 11,

24, 530 N.Y.S.2d 517, 526 N.E.2d 8 (1988) ("Uncommunicated subjective intent alone cannot

create an issue of fact where otherwise there is none."); *Murray Walter, Inc. v. Sarkisian Bros.,*

*Inc.*, 183 A.D.2d 140, 146, 589 N.Y.S.2d 613 (3d Dep't 1992).

Eighth, Dreni argues that "PrinterOn pa[id] Dreni, with the exception of the Docomo Pre-Payment, commissions on named and assigned accounts, regardless of whether they had closed at the time of Dreni's hire."  (Pl.'s Recons. Mem. 22.)  This argument was not raised in Dreni's opposition brief and thus is improperly raised for the first time on reconsideration.  *See Stroh*, 265 F.3d at 115.  In any event, the argument is unavailing for the same reasons the Court rejects Dreni's sixth argument discussed above, with which this variation of argument overlaps.

Ninth, Dreni again argues that he received commissions on Docomo hardware and services revenue.  (Pl.'s Recons. Mem. 22.)  The Court previously found this argument, which Dreni made in his opposition brief (Pl.'s Opp. Summ. J. 11), *see Liburd*, 2009 WL 1605783, at *3, unpersuasive since it simply confirms the parties' joint understanding manifested in Noreikis's e-mail dated June 2, 2012.  (*See* Salmon-Smith Decl. Supp. Ex. E at 2 (Noreikis stating that the Docomo Pre-Payment was excluded from Dreni's commission calculations but that "the hardware that will ship to support the subscriptions will apply to [his] personal and company number").)  Moreover, commissions on hardware and services are expressly provided for in the 2013 Commission Plan. (*See* Jt. 56.1 Ex. 1 at 13.)

Finally, Dreni improperly reiterates the argument that "PrinterOn specifically included in Dreni's post-2013 commission plans exclusions to certain categories of commissions."  (Pl.'s Recons. Mem. 22.)  Dreni argues that if the subsequent commission plans and the Ritchie-Snider e-mail are not relevant for purposes of establishing intent at the time of formation, then the e-mails on which PrinterOn relies are also not relevant.  (Pl.'s Recons. Reply 9.)  Dreni conveniently ignores that the post-execution e-mails on which PrinterOn relies reflect the parties' joint intent and understanding *at the time of contracting*.  Dreni fails to explain how specific exclusions in the

subsequent commission plans create a genuine factual dispute with respect to the parties' intent and understanding as to the Docomo Pre-Payment.

Accordingly, in opposing summary judgment and in seeking reconsideration, Dreni failed to present relevant extrinsic evidence to create a genuine issue of material fact and withstand summary judgment. The relevant extrinsic evidence makes unequivocally clear that the parties intended and understood during negotiations and at the time of contracting that the Docomo Pre-Payment would be excluded from Dreni's commissions calculations. No reasonable jury could find otherwise. *See, e.g.*, *Gilbert v. Related Mgmt. Co.*, 162 F.3d 1147, 1998 WL 650250, at *2 (2d Cir. 1998) (affirming grant of summary judgment where "the documents submitted by [defendant] resolve[d] the ambiguity and ma[d]e plain that the definition of 'earnings' was not intended to include commissions . . . [and plaintiff] presented no extrinsic evidence that conflicts with this interpretation"); *Dreyfuss v. eTelecare Glob. Sols.-U.S., Inc.*, No. 08 Civ. 1115(RJS), 2010 WL 4058143, at *7 (S.D.N.Y. Sept. 30, 2010) (granting summary judgment despite ambiguity in employment agreement and compensation plan because "substantial evidence in the record support[ed] Plaintiff's interpretation" and "*no* evidence in the record" support Defendant's interpretation).

## CONCLUSION

For the foregoing reasons, the Court DENIES Dreni's motion for reconsideration. The Clerk of Court is respectfully requested to close docket entry 89.

IT IS HEREBY ORDERED that on or before September 15, 2021, the parties shall confer and file a joint letter advising the Court of any dates in the first quarter of 2022 (January–March) that they are unavailable for trial, so the Court may request a trial slot.

IT IS FURTHER ORDERED that the parties shall submit their proposed joint pretrial order on or before October 12, 2021.  The parties shall consult the Court's Individual Practice Rules § 7.A and ensure compliance therewith.  The required pretrial filings outlined in § 7.B of the Court's Rules need not be filed with the proposed joint pretrial order.  The Court will set a deadline for these submissions at a later date.

IT IS FURTHER ORDERED that the parties shall appear for a pretrial conference on October 26, 2021, at 10:00 AM.  The conference will be held telephonically.  To join the conference, dial 888-278-0296 and enter access code 5195844.  The parties should be prepared to discuss their proposed joint pretrial order, trial scheduling and logistics, deadlines for pretrial filings outlined in § 7.B of the Court's Rules, and all other pretrial matters.

**SO ORDERED.**

**Date:  September 3, 2021**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**

33